COMPASS INSURANCE COMPANY, a New York corporation; American Employers' Insurance Company, a/k/a Commercial Union Insurance Company, a/k/a Employer's Fire Insurance Company, a Massachusetts corporation; The Hartford Accident and Indemnity Company, a Connecticut corporation; Fireman's Fund Insurance Companies, a California corporation; The American Insurance Company, A New Jersey corporation; and American States Insurance Company, Petitioners/Cross–Respondents,

v.

CITY OF LITTLETON, Colorado, a municipal corporation; and City of Englewood, Colorado, a municipal corporation, Respondents/Cross–Petitioners,

v.

Guaranty National Insurance Company, a Colorado corporation, Cross–Respondent/Cross–Petitioner.

No. 96SC852.

Supreme Court of Colorado, En Banc.

June 28, 1999.

Rehearing Denied Aug. 9, 1999.

Cooper & Clough, P.C., John E. Clough, Denver, Colorado, Traub, Eglin, Liberman, Straus, Richard J. Rogers, Stephen D. Straus, Hawthorne, New York, Attorneys for Petitioner/Cross–Respondent Compass Insurance Company.

Markusson, Green & Jarvis, P.C., James K. Green, Kristin G. Lindberg, Denver, Colorado, Attorneys for Petitioner/Cross–Respondent Commercial Union Assurance Companies.

Roberts & Zboyan, P.C., JoAnne M. Zboyan, Ricardo M. Barrera, Denver, Colorado, Hogan & Harston, L.L.P., William J. Bowman ,David G. Leitch, Washington, D.C., Attorneys for Petitioner/Cross–Respondent Hartford Accident and Indemnity Company.

Cook, Fitch & Hames, Scott R. Cook, Englewood, Colorado, Kaufman & Logan LLP, W. Martin Tellegen, San Francisco, California, Attorneys for Petitioners/Cross–Respondents Fireman's Fund Insurance Company and The American Insurance Company.

Richard W. Laugensen, Denver, Colorado, Bingham Summers, Welsh & Spillman, Martha S. Hollingsworth, James M. Hinshaw, Indianapolis, Indiana, Attorneys for Petitioner/Cross–Respondent American States Insurance Company.

Grimshaw & Harring, A Professional Corporation, Larry W. Berkowitz, William J. Brady, Lisa K. Norberg, Denver, Colorado, Attorneys for Respondent/Cross–Petitioner City of Littleton.

Daniel Brotzman, City Attorney, City of Englewood, Englewood, Colorado, Semple, Miller, DeLay & Mooney, P.C., Martin Semple, Denver, Colorado, Anderson, Kill and Olick, P.C., Edward M. Joyce, John P. Gasior, New York, New York, Attorneys for Respondent/Cross–Petitioner City of Englewood.

Diana L. Terry, Denver, Colorado, Attorney for Cross–Respondent/Cross–Petitioner Guaranty National Insurance Company.

White & Steele, P.C., Frederick W. Klann, Denver, Colorado, Attorneys for Amicus Curiae Insurance Environmental Litigation Association.

P.B. Lynn Walker, Lakewood, Colorado, Attorney for Amicus Curiae Waste Management, Inc.

Zevnik, Horton, Guibork, McGovern, Palmer & Fognani, L.L.P., Brian L. Duffy, Denver, Colorado, Michael Y. Horton, Mark B. Hartzler, Los Angeles, California, Matthew W. Cockrell Chicago, Illinois Attorneys for Amicus Curiae City and County of Denver.

Kevin S. Hannon, Denver, Colorado, Attorney for Amicus Curiae Colorado Trial Lawyers Association.

Geoffrey T. Wilson, General Counsel, Denver, Colorado, Inman, Flynn & Biesterfield, P.C., Richard P. Brentlinger, Joel A. Moritz, Michael J. Glade, Robert J. Thomas, Denver, Colorado, Attorneys for Amicus Curiae Colorado Municipal League.

Justice BENDER delivered the Opinion of the Court.

This appeal raises important and difficult issues of insurance contract interpretation concerning whether certain insurance policies provide liability coverage for environmental pollution under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA).

For a period of several years, Englewood and Littleton (the Cities) jointly operated a wastewater treatment facility that disposed of sewage sludge at the Lowry Landfill. The Environmental Protection Agency (EPA) subsequently notified the Cities that under CERCLA, the Cities were potentially responsible for clean-up costs necessitated by the release of hazardous wastes from the Lowry Landfill. The Cities filed suit, seeking a declaratory judgment that insurance policies they purchased during the 1970s and 1980s from various insurance companies (Insurers) must provide coverage for their liability arising out of their disposal of sewage sludge at the Lowry Landfill and seeking specific performance of the policies as well as damages for breach of contract.

The trial court granted summary judgment to Insurers based on the pollution exclusions in their policies. In addition, the trial court granted summary judgment to some Insurers based on provisions in their policies that exclude coverage for joint ventures that are not also named as insureds under the policies.

The court of appeals affirmed in part and reversed in part. *See City of Englewood v. Commercial Union Assurance Cos.*, 940 P.2d 948 (Colo.App.1996). The court of appeals held that the trial court erred in granting

summary judgment based on the pollution exclusion clause. *See id.* at 956. However, the court of appeals affirmed the trial court's order granting summary judgment to various insurers based on the joint venture clause. *See id.* at 956–57. This court granted certiorari on several issues.[1] We affirm in part and reverse in part.

First, we affirm the court of appeals' judgment that the trial court erred in granting summary judgment based on the pollution exclusion clauses in Insurers' policies, although we do so for different reasons. We decline to follow the interpretation of the standard pollution exclusion clause set forth by the Tenth Circuit in *Broderick Investment Co. v. Hartford Accident & Indemnity Co.*, 954 F.2d 601 (10th Cir.), *cert. denied*, 506 U.S. 865, 113 S.Ct. 189, 121 L.Ed.2d 133 (1992). In contrast to the Tenth Circuit, we construe the words "discharge, dispersal, release or escape" contained in the pollution exclusion clause to refer to the release of pollution from the Lowry Landfill and not the initial disposal of sewage sludge into the landfill by the Cities. In *Hecla Mining Co. v. New Hampshire Insurance Co.*, 811 P.2d 1083, 1092 (Colo.1991), we held that the words "sudden and accidental," contained in the exception to the pollution exclusion clause, meant "unexpected and unintended." Thus, we hold that coverage is restored because the EPA made no allegations that

when the Cities disposed of sewage sludge at the Lowry Landfill, they intended or expected that pollutants would be released from the Lowry Landfill as a consequence of their activity. Hence, we hold that Insurers have a duty to defend because of the exception to the pollution exclusion clause, and the trial court erroneously granted summary judgment for Insurers.

Second, we hold that the court of appeals erred in affirming the trial court's ruling that the Bi–City Plant was a joint venture. Because the term "joint venture" as used in certain insurance policies is undefined and ambiguous, we construe that term against Insurers to exclude an entity formed for the limited purpose of providing more efficient municipal services. Therefore, we reverse the court of appeals in its judgment affirming the trial court's rulings granting summary judgment to some Insurers based on the joint venture clause.

Finally, we hold that EPA actions under CERCLA constitute suits, thereby triggering Insurers' duty to defend, and we hold that response costs under CERLCA are covered damages under the insurance policies.

## I. FACTS AND PROCEEDINGS BELOW

In 1973, the Cities entered into an agreement to build and operate a Bi–City Waste-

---

1. Specifically, we granted certiorari on the following nine issues:

1) Whether "potentially responsible party" (PRP) letters from the Environmental Protection Agency (EPA) to the cities constitute a "suit" under the insurance policies issued by insurance companies.

2) Whether the court of appeals erred in ruling that there was a combined issue of law and fact as to whether the sewage sludge dumped by the cities at the landfill fell within the pollution exclusions contained in the insurance policies issued by the insurance companies, thus precluding summary judgment for the insurance companies based on the pollution exclusion.

3) Whether the court of appeals erred in ruling that it was premature to determine whether the insurance companies have a duty to indemnify the cities.

4) Whether the response costs claimed by the EPA constitute "damages" within the meaning of the applicable insurance policies.

5) Whether the court of appeals erred in granting summary judgment to the insurance compa-

nies by applying the commercially defined "joint venture" clause to the Waste Water Treatment Plant operated by the two cities when it is statutorily defined as a "municipality."

6) Whether the court of appeals erred by failing to recognize that the insurance companies themselves acknowledged that the Bi–City Plant is a municipality and not a joint venture.

7) Whether the "Joint Powers [Agreement] Between Governmental Bodies" designation in the "persons insured" clause in certain policies issued to Littleton conflicts with the joint venture clause, precluding summary judgment.

8) Whether the court of appeals erred in failing to recognize that the insurance companies waived the right to assert the joint venture clause.

9) Whether the court of appeals erred in applying the commercial standard of "profit and loss" to determine whether the Bi–City Plant was a "joint venture," and even if the correct standard was applied, whether there are disputed issues of material fact which would preclude summary judgment based on the joint venture clause.

water Treatment Facility (Bi–City Plant) to process their sewage. From the spring of 1977 through the summer of 1980, the Bi–City Plant disposed of its sewage sludge at the Lowry Landfill in east Denver.

■ In 1985, the EPA sent a letter to Englewood notifying the city that it was one of many Potentially Responsible Parties (PRPs) who, under CERCLA,[2] were jointly and severally liable for the costs of cleaning up the Lowry Landfill. This letter alleged that "[y]our company and many others have disposed of waste at the Lowry Landfill" and that the EPA "has information indicating that your company did, by contract agreement or otherwise, arrange for the disposal, treatment, or·transportation for disposal or treatment of hazardous substances at the Lowry Landfill." The letter further alleged that a release of hazardous substances at the landfill was potentially contaminating groundwater:

> EPA has determined that a release of hazardous substances, as defined by Section 101(14) of CERCLA, has occurred at Lowry. At present, hazardous substances are contaminating the alluvial and bedrock systems at and around the site. Both the alluvial and bedrock aquifers under the Lowry Landfill site are groundwater sources for existing and potential consumption uses offsite, including the supply for domestic, irrigation, and stock watering purposes. EPA will upon request discuss this information with you and provide additional information on the nature and extent of releases at the site.

Three years later, in 1988, the EPA sent two letters addressed to the Bi–City Plant. The first one was a PRP letter alleging that the Plant disposed of hazardous substances at the Lowry Landfill:

EPA has evaluated information concerning persons who may have generated, transported, or disposed of hazardous substances, pollutants, or contaminants at Lowry Landfill. Based on this evidence, EPA believes you may be a potentially responsible party ("PRP") with respect to this site. . . . ˙Specifically, EPA has reason to believe that you arranged, by contract, agreement, or otherwise, for the disposal, treatment, or transportation for the disposal or treatment of hazardous substances found at the facility.

A month later, EPA sent the Bi–City Plant a "Special Notice Letter" informing the Bi–City Plant of the commencement of a sixty-day period of formal negotiations between the EPA and the PRPs associated with the Lowry Landfill.

The Cities sought coverage from Insurers under various liability insurance policies, but the Insurers refused to defend the cities. The Cities then filed suit, seeking a declaration of rights and responsibilities under the policies, specific performance of the insurance contracts, and indemnification.

For the convenience of the reader, we note that the following Insurers are parties to this appeal: Compass Insurance Company (Compass); American Employer's Insurance Company, a/k/a Commercial Union Insurance Company, a/k/a Employer's Fire Insurance Company (Commercial Union); the Hartford Accident and Indemnity Company (Hartford); Fireman's Fund Insurance Companies (Fireman's Fund); the American Insurance Company (American);[3] American States Insurance Company (American States), and Guaranty National Insurance Company (Guaranty National).

In a series of rulings relevant to this appeal, the trial court granted summary judgment for Compass, Commercial Union, Hart-

---

2. As we noted in *Hecla,* 811 P.2d at 1084 n. 1: CERCLA creates statutory liability for present and former owners of hazardous waste disposal sites, transporters of hazardous wastes, and those who arrange for the transport and disposal of hazardous waste. 42 U.S.C. § 9607. Under CERCLA, any party with an ownership interest in the site responsible for the release of contaminants can be held strictly liable regardless of fault or intent. *Id.* The liability under

CERCLA is joint and several, regardless of each party's degree of fault or responsibility for the creation of the hazardous condition.

3. The potential liability of both Fireman's Fund and American in this action apparently arises from a single comprehensive general liability policy issued to the Bi–City Plant by Fireman's Fund.

ford, Guaranty National, American States, Fireman's Fund, and American because some of their policies contained pollution exclusion clauses, which exclude coverage for liabilities arising from polluting activities under certain circumstances. Specifically, the standard pollution exclusion clause excludes from coverage property damage arising from the discharge of waste but restores coverage where that discharge is sudden and accidental:

> This insurance does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, *waste materials or other irritants, contaminants or pollutants* into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental.*

(Emphasis added.)[4] The trial court's order granting summary judgment on the basis of the pollution exclusion clause focussed on the undisputed fact that the Cities' disposal of sewage into the Lowry Landfill was not "sudden and accidental." In reaching its decision to grant summary judgment to Insurers, the trial court followed the analysis of the Tenth Circuit, which held that the phrase "discharge, dispersal, release or escape" referred to the initial placement of waste in a holding pond and did not refer to the subsequent seepage of chemicals from the holding pond into the groundwater. *See Broderick,* 954 F.2d at 607. Noting that in *Hecla,* this court interpreted the words "sudden and accidental" in the exception to the pollution exclusion clause to mean "unintended and unexpected," the trial court found that "[i]t cannot reasonably be maintained by [the Cities] that their dumping at Lowry was not a deliberate discharge under the reasoning of *Broderick.*" Accordingly, the trial court ruled that the pollution exclusion applied and there was no duty to defend.

The trial court also granted motions for summary judgment made by Compass and Commercial Union on the grounds that some of their policies contained joint venture clauses. Specifically, the standard joint venture clause contained in the relevant policies excludes liability coverage for damages arising out of the conduct of a partnership or joint venture that is *not* also a named insured:

> This insurance does not apply to bodily injury or property damage arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a named insured.

In support of this ruling, the trial court found that the Bi–City Plant was a joint venture.

In a consolidated appeal, the court of appeals affirmed in part and reversed in part. *See Englewood,* 940 P.2d at 958.

First, the court of appeals held that the trial court erred in granting summary judgment to Insurers based on the pollution exclusion clauses in their policies. *See id.* at 955. The court of appeals concluded that summary judgment was improper because there existed "an unresolved and potentially dispositive mixed question of law and fact whether domestic sewage sludge is an 'irritant, contaminant, or pollutant' within the meaning of the pollution exclusion clause." *Id.* at 958. In doing so, the court of appeals followed the holdings of two federal district court opinions that applied Colorado law to reach similar conclusions. *Id.* at 955.

The court of appeals acknowledged that the trial court "heavily relied" on *Broderick* when it granted summary judgment to Insurers based on the pollution exclusion clause. *See id.* at 955–956. However, the court of appeals expressly declined to rule on whether it would follow the Tenth Circuit's interpretation of the exception to the pollution exclusion clause:

> [G]iven our earlier conclusion that there is a genuine issue regarding the proper characterization of the cities' sewage sludge, we need not decide whether the trial court's reliance on *Broderick* was appropriate and the discharge by the cities oc-

---

4. In this opinion, when we refer to "the pollution exclusion clause," we mean this entire quoted paragraph. When we refer to "the exception to the pollution exclusion clause," we mean the final phrase: "but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental."

curred at the time of the initial placement of sewage at the Lowry Landfill, or whether it occurred at a later time, as other courts have concluded. If the cities' argument is successful, the need for such a determination may never arise.

*Englewood,* 940 P.2d at 956 (citations omitted).

Second, the court of appeals held that "the trial court erred in granting summary judgment in favor of all insurers concerning the duty to indemnify," finding that "the trial court's resolution of the duty to indemnify was premature." *See id.*

Third, the court of appeals affirmed the trial court's order granting summary judgment to Compass and Commercial Union based on the joint venture exclusion. *See id.* at 956–57. The court of appeals affirmed the trial court's determination that because the term "profits" may include a reduction in costs, the agreement between the Cities establishing the Bi–City Plant satisfied the definitional requirement for joint venture that there be an agreement to share in profits or losses. *See id.* at 957. Noting that the trial court had not ruled on joint venture arguments made by Guaranty National and American States because it had granted their summary judgment motions on the basis of the pollution exclusion, the court of appeals affirmed these summary judgment rulings on the ground that "a correct judgment will not be disturbed on review." *See id.* at 958.

## II. STANDARD OF REVIEW AND PRINCIPLES OF INSURANCE CONTRACT INTERPRETATION

■ "Summary judgment is a drastic remedy and should only be granted if there is a clear showing that no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law." *AviComm, Inc. v. Colorado Pub. Utils. Comm'n,* 955 P.2d 1023, 1029 (Colo.1998). "The nonmoving party is entitled to all favorable inferences that may be drawn from the undisputed facts, and all doubts as to whether a triable issue of fact exists must be resolved against the moving party." *Id.*

■ "An insurance policy is a contract which should be interpreted consistently with the well settled principles of contractual interpretation." *Chacon v. American Family Mut. Ins. Co.,* 788 P.2d 748, 750 (Colo.1990). The interpretation of an insurance contract is a matter of law which we review de novo. *See Union Ins. Co. v. Houtz,* 883 P.2d 1057, 1061 (Colo.1994).

■ Words used in an insurance policy "should be given their plain and ordinary meaning unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended." *Chacon,* 788 P.2d at 750. Courts should not rewrite insurance policy provisions that are clear and unambiguous. *See id.* "However, when a contractual provision is reasonably susceptible to different meanings it must be construed against the drafter and in favor of providing coverage to the insured." *Id.*

■ Here, the court of appeals decided issues related to both the duty to defend and the duty to indemnify. It is frequently said that "the duty to defend is broader than the duty to indemnify and should be viewed separately." *See Englewood,* 940 P.2d at 953. Thus, in some instances, insurers will be found to have a duty to defend even though ultimately it may be determined that they have no duty to indemnify.

■ This court has set a high standard for an insurance company seeking to avoid its duty to defend that focusses on an examination of the allegations in the underlying complaint against the insured:

An insurer seeking to avoid its duty to defend an insured bears a heavy burden. An insurer's duty to defend arises when the underlying complaint against the insurer alleges any facts that might fall within the coverage of the policy. "The actual liability of the insured to the claimant is not the criterion which places upon the insurance company the obligation to defend." Rather, the obligation to defend arises from allegations in the complaint, which if sustained, would impose a liability covered by the policy. "[W]here the insurer's duty to defend is not apparent from the pleadings in the case against the in-

sured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim."

*Hecla*, 811 P.2d at 1089 (citations omitted). "In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove that it cannot." *Standun, Inc. v. Fireman's Fund Ins. Co.*, 62 Cal.App.4th 882, 73 Cal. Rptr.2d 116, 120 (1998). As we further explained in *Hecla*, "[d]etermining the duty to defend based on the allegations contained within the complaint comports with the insured's legitimate expectation of a defense." *Hecla*, 811 P.2d at 1090.

■■ The heavy burden necessary for an insurer to prevail on a *duty-to-defend claim* holds true in the specific context of a determination of whether insurance coverage does not exist because one of the policy's exclusions applies:

> In order to avoid policy coverage, an insurer must establish that the exemption claimed applies in the particular case, and that the exclusions are not subject to any other reasonable interpretation. The insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy. An insurer is not excused from its duty to defend unless there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured.

*Id.* at 1090.

## III. THE POLLUTION EXCLUSION CLAUSE

■■ We agree with the conclusion of the court of appeals that the trial court erred in granting summary judgment to Insurers based on the pollution exclusion clause. However, we disagree with the reasoning that the court of appeals used to reach this result. Under *Hecla*, an insurer's duty to defend is determined by an examination of the allegations in the underlying complaint against the insured. *See Hecla*, 811 P.2d at 1089. Applying this rule here, we conclude

that the court of appeals erred in focussing on whether genuine issues of fact exist as to the factual and legal characterization of municipal sewage sludge, because the EPA did not allege that the Cities disposed of sewage sludge at the Lowry Landfill. Rather, the EPA alleged that the cities disposed of "waste" and "hazardous substances." However, because the trial court applied the analysis of *Broderick*, 954 F.2d 601, which we do not follow, we agree with the court of appeals's conclusion that the trial court erred in granting summary judgment based on the pollution exclusion clauses. Therefore, with respect to the trial court's pollution exclusion summary judgment rulings, we affirm the judgment of the court of appeals, albeit for different reasons.

### A.

We begin our analysis with a brief discussion of the facts and the central holding of *Hecla*. *Hecla* was a consolidated appeal of two cases involving a suit under CERCLA by the state against certain mining companies and a third-party complaint by those mining companies seeking contribution from the Hecla Mining Company. *See Hecla*, 811 P.2d at 1085–86. The relevant factual allegations were that the mining companies caused heavy metals and other contaminants to be discharged from the Yak Tunnel into the California Gulch. *See Hecla*, 811 P.2d at 1085. The tunnel "was designed as a portal for the transportation of ore out of adjacent mines and to allow for drainage of the mine shafts into the California Gulch." *Id.* at 1085 n. 2. The mining companies' mine shafts connected with and drained into the tunnel. *See id.* at 1086. A surge of yellow sedimentary sludge and contaminated water was emitted from the tunnel, causing a twenty-mile stretch of the Arkansas River to turn orange. *See id.* at 1085. In interpreting the exception to the pollution exclusion, we held that the phrase "sudden and accidental" was ambiguous, and we construed this phrase to mean "unexpected and unintended." *Id.* at 1092. Finding that neither of the complaints against the mining companies in that case asserted that the companies expected or intended to discharge pollutants from the tun-

nel, we held that the trial court did not err in granting summary judgment for the insureds by ruling as a matter of law that the insurance company had the duty to defend the mining companies. See *id.*

■ We reiterate the standard set forth in *Hecla* delineating the narrow circumstances under which an insurer may avoid the duty to defend:

> The insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy. An insurer is not excused from its duty to defend unless there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured.

*Id.* at 1090. Applying this standard to the facts of this case, the court of appeals stated, "[W]e need not look beyond the four corners of the complaint to conclude there is a factual and legal basis upon which the insurers might be held liable to indemnify the cities ... because there is a pending legal issue regarding the characterization of domestic sewage sludge." *Englewood,* 940 P.2d at 955. The court of appeals noted that "[s]everal courts have recognized a significant distinction between: (1) toxic industrial sludge; and (2) non-toxic, non-hazardous "biosolids" or domestic sewage sludge, which is suitable for beneficial reuse on agricultural lands or as a soil supplement." *Id.* Finally, the court of appeals relied in part on the fact that "two federal district courts in Colorado have rejected the defendants' argument that, as a matter of law, sewage sludge is an irritant, contaminant, or pollutant." *Id.* (citing *Metro Wastewater Reclamation Dist. v. Continental Cas. Co.,* 834 F.Supp. 1254, 1260 (D.Colo. 1993) and *City of Lakewood v. United States Fire Ins. Co.,* No. 90–Z–880 (D.Colo. Mar.30, 1993) (reprinted in Mealey's Litigation Reports–Insurance Vol. 7, # 30)).[5]

■ In our view, the court of appeals erred in its application of the standards set forth in *Hecla* for determining an insurer's duty to defend. As explained in *Hecla,* Colorado follows the rule that the duty to defend is determined by looking at the allegations of the underlying complaint against the insured. *See Hecla,* 811 P.2d at 1089. This rule is sometimes referred to as the complaint rule.[6] We recognize that the well-reasoned dissent in *Hecla* raised some valid concerns about the application of the complaint rule to complex cases involving liability for environmental pollution under CERCLA. *See id.* at 1092–95 (Mullarkey, J., dissenting). However, the majority in that case also addressed this issue in detail, *see id.* at 1089–90 n. 10, and its conclusion that the duty to defend arises from the allegations in the complaint is precedent that we must follow in this case.

Here, the PRP letters are the functional equivalent of the complaint in the underlying action against the insured Cities, *see* section VI.A., *infra,* and we must examine the allegations contained in the PRP letters in order to decide whether Insurers may avoid their duty to defend. Neither the PRP letter sent to Englewood nor the PRP letter sent to the Bi–City Plant refer to "municipal sewage sludge." Rather, the letters refer to the disposal of "waste" and "hazardous substances" at the Lowry Landfill and to a release of "hazardous substances" from the landfill into the alluvial and bedrock systems at and around the site. Therefore, the court of appeals erred in focussing its analysis on whether there existed "a mixed question of law and fact whether domestic sewage sludge is an 'irritant, contaminant, or pollutant' within the meaning of the pollution exclusion clause." *Englewood,* 940 P.2d at 955.[7] Under the complaint rule, as applied to the facts of this case, courts are not allowed to consider extrinsic facts such as the evidence presented by the cities that the "waste" they disposed of at Lowry was non-hazardous

---

5. Of course, Colorado state courts are not bound by federal district court opinions. *See Ahart v. Colorado Dep't of Corrections,* 964 P.2d 517, 522 (Colo.1998).

6. Susan Randall, *Redefining the Insurer's Duty to Defend,* 2 Conn. Ins. L.J. 221, 222 (1997).

7. In its holding concerning the pollution exclusion, the court of appeals inexplicably failed to address the term ".waste materials," which is also included in the language of the pollution exclusion clause.

sewage sludge that was suitable for beneficial use on croplands.

Based on the PRP letters, the relevant allegations that we must consider are that the Cities are responsible for disposing of "waste" and "hazardous substances" at the Lowry Landfill. The policy language excluding coverage for pollution refers to "waste material or other irritants, contaminants, or pollutants." There can be no serious question that "waste" and "hazardous substances" are wholly subsumed within the categories "waste material or other irritants, contaminants, or pollutants." Hence, we hold that the court of appeals erred in basing its judgment on the characterization of the materials disposed of by the Cities.

Even so, we ultimately agree with the judgment by the court of appeals that the trial court erred in granting summary judgment to Insurers on the basis of the pollution exclusion clause, and therefore we affirm that judgment based on our disagreement with the Tenth Circuit's interpretation of the "sudden and accidental" exception to the pollution exclusion in the *Broderick* decision.[8]

## B.

The trial court relied on *Broderick* for the proposition that the phrase "discharge, dispersal, release, or escape" in the standard pollution exclusion clause refers to the Cities' disposal of wastes into the Lowry Landfill rather than the subsequent release of hazardous substances from the landfill into surrounding areas and groundwater. *See Broderick*, 954 F.2d at 606–07. As the court of appeals recognized, there is a split of authority in the nation on this issue. *See Englewood*, 940 P.2d at 956.[9] The distinction is a meaningful one in many CERCLA cases involving the duty to defend. According to the exception to the standard pollution exclusion clause, the exclusion does not apply if the discharge, dispersal, release or escape of the listed contaminants is "sudden or accidental." Thus, while the pollution exclusion generally operates to remove insurance coverage, the "sudden and accidental" exception to the pollution exclusion, where applicable, restores coverage.[10]

In *Hecla*, this court found that the phrase "sudden or accidental" was ambiguous and interpreted it to mean "unexpected and unintended." *See Hecla*, 811 P.2d at 1092. Thus, under the *Broderick* court's interpretation of the pollution exclusion clause, the clause will exclude coverage whenever a party intentionally disposes of wastes in a containment area, even if that party neither expects nor intends for pollutants to escape from that containment area. Under *Broderick*, there is no duty to defend in such circumstances because coverage is excluded since the waste was intentionally placed into the containment area. In other words, following the Tenth

8. Insurers argue that this court did not grant certiorari on the *Broderick* issue and therefore should not address it. We granted certiorari on the following issue related to the pollution exclusion clause:

> Whether the court of appeals erred in ruling that there was a combined issue of law and fact as to whether the sewage sludge dumped by the cities at the landfill fell within the pollution exclusions contained in the insurance policies, thus precluding summary judgment for the insurance companies based on the pollution exclusion.

The trial court analyzed *Broderick* extensively in its order granting summary judgment based on the pollution exclusion clause. The court of appeals mistakenly declined to address *Broderick* merely because there was a possibility that it could be moot. *See Englewood*, 940 P.2d at 956. Parties on both sides of this dispute briefed the *Broderick* issue to this court. Under these circumstances, and for the sake of judicial economy, we view this certiorari issue broadly to en-

compass the *Broderick* issue. *See Lininger v. Eisenbaum*, 764 P.2d 1202, 1207 n. 8 (Colo. 1988).

9. *Compare St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1204 (1st Cir.1994) (holding that relevant discharge is disposal of waste in landfill) *with Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699, 704 (7th Cir.1994) (holding that the relevant discharge was not the placement of liquid waste into an unlined evaporation pit but rather the leaching of water through the bottom of the pit).

10. In 1985, insurance companies removed this exception to the pollution exclusion clause in the standard form for comprehensive general liability policies, modifying the pollution exclusion from a qualified exclusion to an absolute exclusion. *See* Nancer Ballard and Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion*, 75 Cornell L.Rev. 610, 633 (1990).

Circuit's analysis, the exception to the pollution exclusion clause for unexpected and unintended discharges would not apply to restore coverage under these factual circumstances.

In *Broderick*, the Tenth Circuit was applying Colorado law. *See Broderick*, 954 F.2d at 604. The Tenth Circuit explained that it had waited to decide *Broderick* until this court issued its opinion in *Hecla*. *See id.* Although it acknowledged that *Hecla* addressed the "sudden and accidental" exception to the pollution exclusion clause, the *Broderick* court found that this court had left unresolved the "critical" issue of "whether the placement of waste materials into containment ponds constituted a 'discharge, dispersal, release or escape.'" *See id.* at 605. The *Broderick* court answered this question affirmatively. *See id.* at 607.

▮ We disagree with the *Broderick* analysis.[11] In our view, *Hecla* implicitly held that the phrase "discharge, dispersal, release or escape" in the pollution exclusion does not apply to an initial placement of waste in a containment area such as a licensed landfill. In *Hecla*, applying the complaint rule, this court noted that "[n]either the state's CERCLA complaint, nor the third-party complaint contains claims asserting that Hecla expected or intended the discharge of pollutants into the California Gulch as a result of its mining operations." *Hecla*, 811 P.2d at 1092. Thus, in *Hecla*, this court inquired into the mining company's intent to discharge pollutants from the containment area into the surrounding environment as opposed to the company's intent to place pollutants into the containment area in the first instance.

Since our opinion in *Hecla* only implicitly decided that the relevant polluting event for purposes of the pollution exclusion clause is the release of pollutants from a containment area and not the initial placement of waste in that containment area, we now make this holding explicit. We are persuaded by the analysis and conclusion of the Supreme Court of Washington in *Queen City Farms,*

*Inc. v. Central Nat'l Ins. Co. of Omaha,* 124 Wash.2d 536, 882 P.2d 703 (1994) as follows.

▮ When faced with terms in an insurance policy that are not defined, Washington law, like that of Colorado, dictates that such terms be given their plain, ordinary meaning and interpreted according to the understanding of the average purchaser of insurance. *See id.* at 718; *Simon v. Shelter Gen. Ins. Co.,* 842 P.2d 236, 239–40 (Colo.1992). In both *Queen City* and this case, the key terms "discharge, dispersal, release or escape" in the pollution exclusion are not defined in the insurance policies at issue. *See Queen City,* 882 P.2d at 718. The Supreme Court of Washington found that all of these terms "carry the connotation of the issuance of a substance from a state of containment; none of the terms is normally used to describe the placement of a substance into an area of confinement." *See id.* at 719. In deciding what the average purchaser of comprehensive liability insurance in the 1960s and 1970s would have interpreted the pollution exclusion to mean, the Supreme Court of Washington noted that society's understanding of environmental pollution has evolved over time and recognized that "[w]hen landfills began to be licensed in the late 1960s and early 1970s, landfill operators and even many environmental officials expected the design of a landfill would function to contain pollutants." *Id.*

We agree with the Supreme Court of Washington's conclusion that "the average purchaser of insurance would have understood that mere placement of wastes into a place which was thought would contain or filter the wastes would not have been an event which would fall within the exclusion." *Id.* Thus, we agree with the holding of the Supreme Court of Washington that "where material has been deposited in a place which was believed would contain or safely filter the material, such as a waste disposal pit or sanitary landfill, the polluting event is the discharge, dispersal, release, or escape from that place of containment into or upon the

---

11. This court is not bound by a federal circuit court's interpretation of Colorado law. *See Peo-*

*ple v. Barber,* 799 P.2d 936, 940 (Colo.1990).

land, the air or water, including groundwater." *Id.*

We return briefly to our opinion in *Hecla.* Our ultimate holding in that case was that the trial court did not err in granting summary judgment for Hecla, the insured, on the duty to defend. *See Hecla,* 811 P.2d at 1092. Once again, the rationale for that holding was that neither of the complaints at issue asserted that Hecla expected or intended the discharge of pollutants from the tunnel. *See id.*

■■■■ Applying these standards to the facts of this case, we begin with the proposition that the PRP letters are the functional equivalent of the complaints at issue in *Hecla. See* section VI.A., *infra.* Neither of the PRP letters alleges that the Cities expected or intended the release of hazardous substances from the Lowry Landfill. "The insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy." *Id.* Under this exacting standard, the insurer bears the burden of establishing that the exception to the pollution exclusion cannot apply to restore coverage.[12] Here, there is no allegation in the PRP letters that the Cities expected or intended the release of hazardous substances from Lowry. Thus, Insurers have not (and cannot, on the undisputed record before us concerning the allegations of the PRP letters) establish the inapplicability of the exception to the pollution exclusion.[13] Therefore, as a matter of law, we hold that Insurers are not excused from their duty to defend the Cities by operation of the pollu-

tion exclusion because the exception to the pollution exclusion applies to restore liability coverage to the Cities.[14] Accordingly, we hold that the trial court erred in granting summary judgment for Insurers based on the pollution exclusion clauses in their policies.

## IV. THE JOINT VENTURE EXCLUSION

The court of appeals affirmed the trial court's orders granting summary judgment to Compass and Commercial Union on the ground that some of their policies contained joint venture clauses. *See Englewood,* 940 P.2d at 956–57. In doing so, the court of appeals affirmed the trial court's conclusion that the Bi–City Plant constituted a joint venture between the Cities and was therefore excluded from coverage from certain policies issued to the Cities. *See id.* at 957.

■■■ In the trial court, Guaranty National and American States moved for summary judgment on the basis of both the pollution exclusion clause and the joint venture clause. *See id.* at 958. The trial court granted summary judgment to these companies based on the pollution exclusion clauses in their policies and did not rule on the joint venture issue with respect to these companies. *See id.* Following the principle that a correct judgment will not be disturbed on appeal, the court of appeals did not reverse the summary judgment rulings for Guaranty National and American States based on the pollution exclusion clause but rather affirmed these rulings based on the joint venture clause. *See*

12. We recognize that in the context of a case concerning the duty to indemnify, the court of appeals recently held that the insured bears the burden of proving an exception to an exclusion provision in an insurance contract. *See Public Serv. Co. v. Wallis & Cos.,* 955 P.2d 564, 568–69 (Colo.App.1997), *cert. granted,* No. 97SC792 (Colo. May 26, 1998). However, the *Wallis* court distinguished that case from cases such as *Hecla* that involve the duty to defend, and it reaffirmed the basic principle that the duty to defend is broader than the duty to indemnify. *See id.* at 568.

13. In other words, Insurers have failed to demonstrate that "there is no factual or legal basis on which [they] might eventually be held liable to

indemnify the insured[s]." *Hecla,* 811 P.2d at 1092.

14. Guaranty National argues that, unlike any of the other policies in this case, each of the four policies that it issued to the City of Littleton contains an *exception* to the exception to the pollution clause. However, this exception to the exception is limited to circumstances in which the insured has approved "of the disposal or storage of chemicals or chemical waste material by other parties." Because the EPA's allegation against the City of Littleton is broader than the terms of this exception to the exception to the pollution exclusion clause, it does not apply to nullify the "sudden and accidental" exception to the pollution exclusion clause.

*id.* Reviewing the trial court's interpretation of the joint venture clause *de novo*, we construe the ambiguous term "joint venture" against the Insurers and conclude that the trial court erred in ruling that the Bi–City Plant was a joint venture. Therefore, we hold that summary judgment should not have been entered on behalf of any of the Insurers on the basis of the joint venture clause, and we reverse these rulings of the court of appeals.

## A.

We begin by reiterating the fundamental principle that an ambiguous provision in an insurance policy contract must be construed against the drafter and in favor of providing coverage to the insured. *See Chacon,* 788 P.2d at 750. An ambiguous provision is a provision that is "reasonably susceptible to different meanings." *Id.* Thus, in *Hecla,* we explained that "[i]n order to avoid policy coverage, an insurer must establish that the exemption claimed applies in the particular case, and that the exclusions are not subject to any other reasonable interpretations." *Hecla,* 811 P.2d at 1090.

Here, the term "joint venture" was not defined by the insurance companies that drafted the insurance policies at issue. The joint venture clauses appear in the "persons insured" sections of the insurance policies. Unlike the pollution exclusion clauses, the joint venture clauses are not delineated as exclusions for coverage within the separate exclusion sections in the policies.

■ A joint venture is a type of relationship under the law of partnership and agency; it is not defined by regular, non-legal dictionaries. Both the trial court and the court of appeals relied on the technical legal definition of "joint venture" as set forth in our case law:

A joint venture exists when there is: (1) a joint interest in property; (2) an express or implied agreement to share in profits or losses of the venture; and (3) actions and conduct showing joint cooperation in the venture.

*Englewood,* 940 P.2d at 957 (*citing Hancock Constr. Co. v. Cummins,* 791 P.2d 1208 (Colo. App.1990)).

Both the Insurers and the Cities frame their arguments according to this definition of a joint venture. The Cities concede that the first and third elements are present in their agreement to form the Bi–City Plant. However, they dispute that there was any agreement between them to share in profits or losses. Insurers argue, and the courts below held, that a reduction in costs resulting from the fact that the Bi–City Plant enables the Cities to provide necessary services to their residents more efficiently than they would otherwise be able to provide constitutes an agreement to share profits. *See Englewood,* 940 P.2d at 957. In doing so, the court of appeals relied on dictionary definitions of the term "profit" to interpret that term broadly to mean a "benefit" or an "advantage." *See id.*

■ Although it is certainly appropriate to rely on dictionary definitions of undefined terms used in an insurance contract, we note that the term "profit" does not appear in the insurance policy exclusion at issue but rather derives from the technical legal definition of joint venture. For this reason, we find the reasoning of the court of appeals ultimately unpersuasive, especially in light of the rule that ambiguous terms are to be construed against the insurer that drafted the policy and in favor of policy coverage. *See Chacon,* 788 P.2d at 750.

Under Colorado law, the term "joint venture" is most frequently associated with a business or commercial enterprise.[15] In such contexts, it may make sense to broadly construe the term "profits" in our definition of a joint venture to include a reduction in costs; because such entities are in the business of generating profits, any savings in costs they achieve necessarily results in greater profits.

**15.** *See, e.g., City and County of Denver v. Fey Concert Co.,* 960 P.2d 657, 661 (Colo.1998) ("One type of agency relationship is a joint venture, which is an association of two or more persons formed for the purpose of carrying out a particu-lar business enterprise for profit.") (*citing* Harold Gill Reuschlein and William A. Gregory, *The Law of Agency and Partnership* § 266, at 451 (2d ed.1990)).

Here, however, there is no evidence in the record that the Bi–City Plant was in the business of generating profits. Rather, the agreement establishing the Bi–City Plant represents the Cities' attempt to efficiently pay for municipal wastewater treatment services, which they must provide to their residents, in accordance with legislation permitting them to provide such services jointly.[16] In contexts such as this, where the joint entity is not-for-profit, it is questionable whether the term "profits" should be broadly construed to include a reduction in costs or more narrowly construed to mean commercial revenues. Since we find the term "profits" to be ambiguous, we also hold that the term "joint venture" as used in the insurance contracts here is ambiguous. Therefore, we must construe this term against the insurance companies that drafted the policies and in favor of providing coverage to the insured. *See Chacon,* 788 P.2d at 750. Accordingly, we construe the term joint venture as used in the insurance policies here narrowly to exclude an entity formed for the limited purpose of providing more efficient municipal services.

Thus, reviewing the trial court's interpretation of the joint venture clause of the insurance contract *de novo,* we hold that the trial court erred in concluding that the Bi–City Plant was a joint venture. Therefore, we reverse the judgment of the court of appeals affirming summary judgment for Compass, Commercial Union, Guaranty National, and American States based on the joint venture clauses in certain of their policies.

### B.

Our analysis of the joint venture clause, section IV.A., *supra,* is dispositive of all of the joint venture-based summary judgment rulings that were the subject of this appeal. Hence, we do not address whether summary judgment on the basis of the joint venture clause was precluded by the fact that the Bi–City Plant is statutorily defined as a "municipality." Similarly, we decline to address whether the "Joint Powers Between Govern-

mental Bodies" designation in the "persons insured" clause in certain policies issued to the City of Littleton conflicts with the joint venture clause, thereby precluding summary judgment.

The Cities make three other arguments related to the joint venture clause which, for the sake of clarifying the complex record in this case, we briefly address here.

### 1.

The Cities contend that the court of appeals failed to recognize that the insurance companies acknowledged that the Bi–City Plant is a municipality and not a joint venture. Based on our reading of the record, this argument applies to Commercial Union only. We simply note that the Cities are correct that Commercial Union issued two comprehensive general liability policies to the Bi–City Plant itself and that in each of these policies, Commercial Union identified the "named insured" – i.e., the Bi–City Plant—as a municipality and not as a joint venture.

### 2.

The Cities also contend that the court of appeals erred in failing to recognize that the insurance companies waived the right to assert the joint venture clause as a defense. We disagree, based on the long-standing principle that a waiver "cannot have created liability where none existed under the policy." *Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.,* 764 P.2d 1191, 1198 (Colo.1988); *see also Hartford Live Stock Ins. Co. v. Phillips,* 150 Colo. 349, 352, 372 P.2d 740, 742 (1962) ("the doctrine of waiver cannot be invoked to create a primary liability and bring within the coverage of the policy risks not included or contemplated by its terms").

### 3.

Finally, the City of Littleton argues that the court of appeals erroneously affirmed summary judgment rulings for Guaranty National with respect to four policies that it

---

16. Colorado law anticipates that local governments may cooperate in the joint exercise of functions, services, and facilities that each has

the authority on its own to provide. *See* § 29–1–203, 9 C.R.S. (1998); § 25–8–103(11), 8 C.R.S. (1998).

issued to the City of Littleton when only one of those policies actually contained a provision excluding coverage for joint ventures that are not also named insureds. Guaranty National does not dispute this factual assertion. Rather, it suggests a different interpretation of the court of appeals opinion, arguing that the court of appeals only affirmed summary judgment for Guaranty National with respect to that one policy.

According to our reading of the court of appeals opinion and of the record in this case, the Cities' concern is valid. Guaranty National issued four policies to the City of Littleton. It moved for summary judgment based on the pollution exclusion clause with respect to all four policies and for summary judgment based on the joint venture clause with respect to one policy only. The trial court granted Guaranty National's summary judgment motion based on the pollution exclusion clause; that is, it granted summary judgment with respect to all four policies. Our reading of the court of appeals opinion in this case is that the court of appeals mistakenly assumed that all four policies also contained joint venture clauses. *See Englewood,* 940 P.2d at 958 ("because a correct judgment will not be disturbed on review, [Guaranty National and American States] now are entitled to affirmance of their summary judgment on the duty to defend based on the joint venture exclusion"). Had the court of appeals realized that only one of the four policies issued by Guaranty National contained a joint venture clause, the court undoubtedly would have reversed the trial court's summary judgment rulings with respect to the other three policies. However, in light of our holding in section IV.A., *supra,* this mistake is irrelevant.

## V. DUTY TO INDEMNIFY

Our reversal of the judgment of the court of appeals on the joint venture clause renders moot the argument by Insurers that the court of appeals erred in holding that resolution of the duty to indemnify is premature. However, because this is an issue that is likely to recur in future disputes over insurance contracts, we briefly analyze it here.

Although the court of appeals affirmed several summary judgment rulings on the duty to defend in favor of Insurers, it held that "a resolution of the duty to indemnify would be premature." *Englewood,* 940 P.2d at 958. We believe this statement to be inaccurate. It is true that a resolution of the duty to indemnify is premature where there is a duty to defend but the liability of the insured has not yet been determined. *See Hecla,* 811 P.2d at 1086 n. 5. However, once an insurer has prevailed on the duty to defend, the issue of the duty to indemnify is ripe for resolution because "[w]here there is no duty to defend, it follows that there can be no duty to indemnify." *Constitution Assocs. v. New Hampshire Ins. Co.,* 930 P.2d 556, 563 (Colo.1996).

Our decision here today renders this issue moot because all rulings that Insurers do not have a duty to defend are hereby vacated. Hence, under these circumstances, the resolution of the duty to indemnify is not yet ripe.

## VI. REMAINING ISSUES

We also granted certiorari on whether the PRP letters from the EPA to the Cities constitute "suit[s]" under the insurance policies issued by Insurers and whether the response costs claimed by the EPA under CERCLA constitute "damages" within the meaning of those policies. The court of appeals did not address these contentions by the Cities. *See Englewood,* 940 P.2d at 958. However, we note that the Cities preserved these issues by raising them both in the trial court and before the court of appeals.

The standard coverage provision in the insurance policies at issue here reads as follows:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay *as damages* because of
>
> A. bodily injury or,
>
> B. property damage
>
> to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend *any suit* against the insured seeking damages on

account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

## A. "SUIT[S]" INCLUDES CERCLA ACTIONS INITIATED BY PRP LETTERS

■■■ Insurers argue that the "suit[s]" that are covered·under the liability policies issued to the Cities only provide coverage for formal actions initiated in a court of law. Therefore, Insurers contend that the policies do not provide coverage for administrative actions such as the EPA action against the Cities that was initiated by the PRP letters. We disagree. We find that the term "suit" is ambiguous, and we hold that an EPA action under CERCLA is sufficiently coercive to constitute a "suit" as that term is used in the insurance policies.

In reaching this conclusion, we are persuaded by and follow the analysis of the Supreme Court of Michigan in *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.*, 445 Mich. 558, 519 N.W.2d 864 (1994). The *Bronson* court took note of a split of authority regarding "the definition of the term 'suit,' and its application to nontraditional legal proceedings." *See Bronson*, 519 N.W.2d at 869. Finding that not all dictionary definitions of "suit" included a reference to some type of court proceeding, the *Bronson* court stated that "[t]he existence of these alternative and more general definitions of 'suit' persuasively suggests that a typical layperson might reasonably expect the term to apply to legal proceedings other than a court action initiated by a complaint." *Bronson*, 519 N.W.2d at 869.

As the *Bronson* court further explained, the coercive nature of CERCLA renders the receipt of a PRP letter "the functional equivalent of a suit brought in a court of law." *Id.* at 871. By enacting CERCLA, Congress "deliberately and painstakingly developed a system in which a PRP has every incentive to 'voluntarily' cooperate with the EPA, before actual litigation, and where significant legal prejudice may develop if the PRP fails to do so." *Id.* at 870. For example, under CERCLA, the EPA has the authority to "develop an essentially binding record and to design and implement actions that the PRPs may later be held liable for." *Id.* As the *Bronson* court noted, the EPA's development of an administrative record in a CERCLA action is particularly important because liability under CERCLA is strict liability, and defenses are "virtually nonexistent." *Id.* at 871 n. 14.[17] Thus, as the Supreme Court of Iowa has remarked, "[e]arly involvement in the settlement discussions is ... often crucial to protect one's interests." *A.Y. McDonald Industries. Inc. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 629 (Iowa 1991) (holding that the term "suit" in an insurance contract encompasses any attempt to gain an end by legal process, including an administrative action under CERCLA).

Thus, we hold that the term "suit" as used in the insurance policies encompasses not only traditional lawsuits filed in court but also coercive administrative actions such as those initiated by PRP letters under CERCLA.

## B. "DAMAGES" INCLUDES CERCLA RESPONSE COSTS

■■■ We similarly join the many other jurisdictions that have held that government mandated response or cleanup costs under CERLCA constitute "damages" as that term is used in the insurance policies.

Insurers ask us to draw a bright-line distinction between legal remedies and equitable remedies and to hold that the definition of "damages" is limited to damages ordered

---

**17.** Defenses under CERCLA are limited to situations in which the release of hazardous substances was solely caused by an act of God, an act of war, an act of a third party other than an employee or agent of the defendant, or any combination of these factors. *See* 42 U.S.C. § 9607(b) (1998).

by a court of law. We decline to do so, since we are required to give undefined terms in an insurance policy their plain and ordinary meaning and to construe ambiguitiès against the drafter and in favor of providing coverage. *See Chacon,* 788 P.2d at 750. As many courts have noted, if Insurers intended the term "damages" to have only a limited technical meaning, they had the opportunity to clearly indicate this in their policies. *See Metro Wastewater,* 834 F.Supp. at 1259 (applying Colorado law); *Hartford Accident & Indem. Co. v. Dana Corp.,* 690 N.E.2d 285, 298 (Ind.App.1997); *A.Y. McDonald,* 475 N.W.2d at 621. They did not do so. Thus, we join these and other courts that have held that the ordinary meaning of "damages" is broad and covers environmental response costs. *See also Boeing Co. v. Aetna Cas. and Sur. Co.,* 113 Wash.2d 869, 784 P.2d 507, 516 (1990).

## VII. CONCLUSION

We affirm the judgment of the court of appeals that the trial court erred in granting summary judgment to Insurers based on the pollution exclusion clause. However, we do so based on our interpretation that the "discharge, dispersal, release or escape" referred to in the pollution exclusion clause is the release of contaminants from the landfill and not the initial placement of sewage sludge into the landfill. We reverse the court of appeals on its analysis of the joint venture clause, and we hold that the trial court erred in granting summary judgment to Compass, Commercial Union, Guaranty National, and American States on the basis of the joint venture exclusion. Finally, we hold that the term "suit" in the insurance policies encompasses EPA actions under CERCLA and the term "damages" encompasses CERCLA response costs. Therefore, we affirm in part and reverse in part and direct the court of appeals to remand this case to the trial court for further proceedings consistent with this opinion.

Justice KOURLIS does not participate.