SAFEHOUSE PROGRESSIVE ALLIANCE FOR NONVIOLENCE, INC., f/k/a Boulder County Safehouse, Inc., a Colorado nonprofit corporation, Plaintiff–Appellant,

v.

QWEST CORPORATION, a Colorado corporation; McLeodUSA Publishing Company, d/b/a Yellow Book USA, an Iowa corporation; and Verizon Directories Corporation, a Delaware corporation, Defendants–Appellees.

No. 06CA0083.

Colorado Court of Appeals, Div. II.

June 14, 2007.

Hutchinson Black and Cook, LLC, William D. Meyer, Christopher W. Ford, Constance Tromble Eyster, Boulder, CO, for Plaintiff–Appellant.

Brownstein Hyatt & Farber, P.C., Timothy R. Beyer, Peter J. Korneffel, Richard P. Barkley, E. Tim Walker, Denver, CO, for Defendant–Appellee Qwest Corporation.

Moye White, LLP, Scott R. Bauer, William F. Jones, Denver, CO, for Defendant–Appellee McLeodUSA Publishing Company.

Senter Goldfarb & Rice, L.L.C., William L. Senter, Billy–George Hertzke, Denver, CO, for Defendant–Appellee Verizon Directories Corporation.

Opinion by Judge CASEBOLT.

In this negligence action, Safehouse Progressive Alliance for Nonviolence, Inc. (SPAN), formerly known as Boulder County Safehouse, Inc., appeals the summary judgment in favor of defendants, Qwest Corporation, McLeodUSA Publishing Company, doing business as Yellow Book USA, and Verizon Directories Corporation. We affirm.

SPAN is a nonprofit corporation that, among other services, provides refuge at an emergency shelter in Boulder for battered women and children seeking to escape violent assailants. In December 2002, a SPAN employee contacted a Qwest customer service representative (CSR) to obtain a digital subscriber line (DSL). The employee indicated that she was calling on behalf of the Boulder County Safehouse.

The DSL service required the customer to provide a local telephone connection. The CSR offered the employee a package called "Qwest Business Line Plus," which included a business telephone line that would serve as the local telephone connection. Among other things, the package included a directory listing, which would contain the address of the premises at which the DSL line would be installed.

The SPAN employee ordered the package, and the transaction was completed. The employee did not tell the CSR that the line would be installed at SPAN's shelter and did not request that the listing be nonpublished, nor did the CSR mention that it would be published. In the past, SPAN had taken measures to ensure that the shelter address remained confidential.

Because the SPAN employee had not requested that the listing be nonpublished, the shelter's address subsequently became available on Qwest's directory assistance and

through Qwest Dex, Inc. (Dex). Qwest also sold the directory listing to third parties, including Yellow Book and Verizon, which had requested Qwest to provide them with its published listings.

In May or June 2003, a SPAN volunteer called directory assistance to obtain SPAN's telephone number. Because SPAN had multiple telephone numbers, the operator asked whether the volunteer wanted the number at a particular address, one of which was the physical address for the shelter. The volunteer reported this to SPAN's office manager, who contacted Qwest.

SPAN's manager informed Qwest that its confidential shelter address was being disseminated by directory assistance. A Qwest employee erroneously told the manager that directory assistance was operated by Dex, and directed her to call Dex to remedy the problem. In fact, directory assistance was operated by Qwest. During this phone call, Qwest did not inform SPAN that Qwest had sold or otherwise disseminated the directory listing. After the call, because there had not been a request that the listing be nonpublished, Qwest continued to disseminate the listing and did not notify those who had obtained it to request that it not be published.

In August 2003, Yellow Book began delivering its Boulder/Longmont Yellow Book, which contained the shelter address. Soon after, Verizon began delivering its Greater Denver SuperPages, which also contained the shelter address.

In September 2003, SPAN learned that the shelter address had been published in the Yellow Book directory. When SPAN contacted Yellow Book to deal with the problem, a Yellow Book representative stated that it had purchased the listing from Qwest. SPAN then contacted Qwest and requested that its listing be nonpublished. Qwest immediately removed the listing from directory assistance and took steps to ensure the address would not appear in any subsequent directories.

SPAN then instituted this action, asserting claims against Qwest for negligence, breach of contract, misappropriation of trade se-

crets, and violation of the Colorado Consumer Protection Act. SPAN also asserted claims for negligence and misappropriation of trade secrets against Dex, Yellow Book, and Verizon. SPAN asserted that it was forced to relocate its shelter because its secret address had been published, claiming more than $3 million in damages. Dex later settled the claims brought by SPAN and was dismissed from the case.

Defendants moved for, and the trial court granted, summary judgment on all claims. As relevant here, the trial court ruled that the claims against Qwest were either precluded by the filed tariff doctrine or failed because Qwest owed no legal duty to SPAN with respect to the address. The court also concluded that Yellow Book and Verizon did not owe SPAN a legal duty under these circumstances. The sole issue on appeal is whether SPAN's negligence claims should be reinstated for trial.

I.

SPAN contends that Qwest's actions present factual issues precluding summary judgment. Because we conclude that there are no material facts in dispute and SPAN's claims fail as a matter of law, we disagree.

We review a summary judgment de novo. Summary judgment is proper only upon a showing that there are no issues of material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *McCormick v. Union Pac. Res. Co.*, 14 P.3d 346, 348 (Colo.2000). The nonmoving party is entitled to all favorable inferences that may be drawn from the undisputed facts, and all doubts as to whether a triable issue of fact exists must be resolved against the moving party. *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo.1999).

Under § 40-3-103, C.R.S.2006, a public utility such as Qwest is required to file tariffs of "rates, tolls, rentals, charges, and classifications collected or enforced, or to be collected and enforced, together with all rules, regulations, contracts, privileges, and facilities which in any manner affect or relate to rates, tolls, rentals, classifications, or service." Here, Qwest's filed tariffs describe, among

other things, the "Qwest Business Line Plus" package purchased by SPAN.

■ Where applicable, a filed tariff carries the force of law. *U S W. Commc'ns, Inc. v. City of Longmont*, 948 P.2d 509, 516 (Colo.1997). In this context, the filed tariff doctrine holds that the "rate of the carrier duly filed is the only lawful charge," and that "[d]eviation from it is not permitted upon any pretext." *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222, 118 S.Ct. 1956, 1962, 141 L.Ed.2d 222 (1998)(quoting *Louisville & Nashville R.R. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915)).

■■ Filed tariffs are not limited only to rates.

> Not only is a carrier forbidden from charging rates other than as set out in its filed tariff, but customers are also charged with notice of the terms and rates set out in that filed tariff and may not bring an action against a carrier that would invalidate, alter or add to the terms of the filed tariff.

*Evanns v. AT & T Corp.*, 229 F.3d 837, 840 (9th Cir.2000) (footnote omitted). "The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., supra*, 524 U.S. at 227, 118 S.Ct. at 1965 (quoting *Keogh v. Chicago & Nw. R.R.*, 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922)).

■ Thus, a common law claim that is inconsistent with the terms of a filed tariff is barred. *See Redfern v. U S W. Commc'ns, Inc.*, 38 P.3d 566, 567 (Colo.App.2000); *Shoemaker v. Mountain States Tel. & Tel. Co.*, 38 Colo.App. 321, 323, 559 P.2d 721, 723 (1976). Further, if the subject matter of a claim falls within a tariff's scope, then the extent of the carrier's liability may be limited by the tariff. *See Shoemaker v. Mountain States Tel. & Tel. Co., supra*, 38 Colo.App. at 324, 559 P.2d at 724.

■ SPAN contends that Qwest breached a duty of care on three separate occasions. We conclude that SPAN's negligence claims are barred by the filed tariff doctrine and by federal law, and that the tariffs limit Qwest's liability to zero as a matter of law.

■ Standard principles of statutory construction apply to the interpretation of a tariff. We must give effect to the intent of the regulatory agency by looking first at the language of the tariff. The language must be read and considered as a whole, and it should be construed to give consistent, harmonious, and sensible effect to all its parts. We need not defer to the trial court's construction of the tariff. *Redfern v. U S W. Commc'ns, Inc., supra*, 38 P.3d at 568.

## A.

SPAN contends that Qwest was negligent in December 2002 when it published the shelter address in the listing and sold it to third parties. Specifically, SPAN asserts that Qwest had a duty to notify it that the address would be published and sold, or affirmatively to ascertain whether SPAN wanted the address published. We conclude that this claim is inconsistent with the tariffs and is therefore barred by the filed tariff doctrine and federal law.

## 1.

Section 5.9.1(D)(2)(e) of the Exchange and Network Services Tariff provides, "One primary directory listing is furnished without charge for each "QWEST BUSINESS LINE PLUS." Section 5.7.1(C) of the same tariff concerns "Directory Services." It states that "[o]ne listing, the Primary Listing, is provided without charge for ... [e]ach exchange access line service."

Section 5.7.1(A)(2) of the tariff describes listings. It provides in pertinent part that an alphabetical listing consists of "name(s), address of the premises upon which the service is located and the telephone number."

Section 5.7.1(C)(4) of the tariff provides that *"[a]t the request of the customer*, the Primary Listing may be omitted from the directory (nonlisted service) or from both the directory and the information records (nonpublished service)." (Emphasis supplied.) Accordingly, unless the customer requests to the contrary, a listing will be set forth in the directory and information records and, thus, will be published.

Here, under the plain language of the tariff, Qwest was required to provide and publish a listing for SPAN that included the address, unless SPAN requested nonpublished service. SPAN is charged with notice of this requirement. *See Evanns v. AT & T Corp., supra,* 229 F.3d at 840. It is undisputed that SPAN did not request nonpublished service when it ordered the DSL service.

If allowed, SPAN's claim would necessarily alter Qwest's duties under the tariff because it would require Qwest affirmatively to notify customers that the listing will be published or inquire whether the customer wants the address published. Because SPAN's claim would change the duties under the tariff, it is barred. *See Redfern v. U S W. Commc'ns, Inc., supra,* 38 P.3d at 567.

SPAN argues that the tariff is inapplicable because the listing was published in the yellow pages, not in the white pages, and the white pages is the "directory" referred to in the tariff. This argument fails for two reasons.

First, nothing in the directory services listing description limits the alphabetical directory to "white pages." Indeed, section 2.4.4(C) of the tariff, which prescribes liability limitations, references the omission of a customer alphabetical directory listing from the yellow pages, implying that the "alphabetical directory" includes both white and yellow pages.

Contrary to SPAN's contention, *Shoemaker v. Mountain States Tel. & Tel. Co., supra,* and *University Hills Beauty Academy, Inc. v. Mountain States Tel. & Tel. Co.,* 38 Colo.App. 194, 554 P.2d 723 (1976), do not dictate to the contrary. The tariffs quoted above were not at issue in those cases, and *University Hills* dealt with the placement of a private advertisement in the yellow pages, not simply a listing. Thus, the division's statement there that "[t]he publication of the yellow pages in a telephone directory is wholly a matter of private concern," *University Hills Beauty Academy, Inc. v. Mountain States Tel. & Tel. Co., supra,* 38 Colo.App. at 196, 554 P.2d at 725, and thus is not affected by tariffs, must be read in that context. SPAN's claim here does not relate to a private contractual advertisement, but concerns simply an alphabetical listing.

Second, SPAN essentially argues that any duty it had was to request a nonpublished listing in the official white pages, but that it did not have a duty to request a nonpublished listing on directory assistance or elsewhere. However, the tariff defines the duties owed by Qwest when a customer orders service, no such differentiation is delineated in the tariff, and any claim that would change or alter Qwest's duties under the tariff is barred. *See Redfern v. U S W. Commc'ns, Inc., supra,* 38 P.3d at 567.

Under SPAN's interpretation, Qwest could not be held liable for publishing the information in the white pages but could be held liable for publishing the information on directory assistance or in the yellow pages, yet the harm to SPAN would be exactly the same. It would make little sense to require Qwest to ascertain whether a customer wants its listing published on directory assistance when Qwest is under no duty to ascertain whether the customer wants the listing published in the white pages. The publishing of the information is the harm that SPAN seeks to prevent, and the tariff states that it is the customer's duty to ensure that the information remains nonpublished.

2.

SPAN contends that Qwest had a duty to notify it that the listing containing the address would be sold, or a duty to ascertain whether SPAN wanted the listing sold. This contention is inconsistent with federal law and is therefore barred.

The federal statute concerning privacy of customer information, 47 U.S.C. § 222(e), provides that a "telecommunications carrier that provides telephone exchange service shall provide subscriber list information gathered in its capacity as a provider ... to any person upon request for the purpose of publishing directories in any format."

"Subscriber list information" is defined as any information "identifying the listed names of subscribers of a carrier and such subscribers' telephone numbers, *addresses,* or primary advertising classifications ... that the

carrier or an affiliate has published, caused to be published, or accepted for publication in any directory format." 47 U.S.C. § 222(h)(3) (emphasis added).

Here, SPAN's information was clearly published or "accepted for publication in any directory format," because SPAN did not request that it be nonpublished. Qwest accepted the information, placed it on directory assistance, and was required to publish it. Therefore, pursuant to § 222(e) Qwest had a duty to provide the subscriber information to anyone, upon request, for the purpose of publishing directories. Qwest supplied the information to third parties as required, including Yellow Book and Verizon.

SPAN's claim, if allowed, would require Qwest to withhold subscriber list information that had been published or "accepted for publication in any directory format." Any such claim would, at the minimum, create a federal preemption problem, because it would require Qwest to comply with inconsistent state and federal laws. Under such circumstances, federal law prevails. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990). Hence, SPAN's claim regarding the sale of the listing is barred.

### B.

SPAN next contends that Qwest was negligent in May or June 2003 when Qwest was informed that the shelter address was being disseminated. SPAN asserts that Qwest concealed the fact that it had sold the listing, mistakenly referred SPAN to Dex, did not contact those to whom it had distributed the listing to request that they cease its publication, and continued selling the listing. We conclude that SPAN's claim asserting that Qwest concealed the fact that it had sold the listing is barred. SPAN was charged with notice that its listing would be published and sold unless it requested the information to be nonpublished. *See Evanns v. AT & T Corp.*, *supra*, 229 F.3d at 840.

We further conclude that the tariffs limit any other potential liability to zero. Section 2.4.4(A) of the Exchange Tariff provides:

The Company's liability arising from errors in or omissions of directory listings shall be limited to and satisfied by a refund not exceeding the amount of the charges for such of the customers [sic] service as is affected during the period covered by the directory in which the error or omission occurs.

Section 2.1.3(A) of the Access Tariff provides:

The Company's liability, if any, for its willful misconduct is not limited by this Tariff. With respect to any other claim or suit, by a customer or any others, for damages associated with the installation, *provision*, preemption, termination, maintenance, repair or restoration *of service* . . . the Company's liability . . . shall not exceed an amount equal to the proportionate charge for the service for the period during which the service was affected.

(Emphasis supplied.)

Even if we assume that when SPAN notified Qwest that the address was being disseminated, Qwest had a duty to cease dissemination of the listing on directory assistance, to cease selling it to third parties, and to contact those who had obtained the listing to request they cease dissemination of the address or to retrieve the listing, we conclude that SPAN's claims fall within the liability limitations of both tariffs.

Any error by Qwest in disseminating or selling the listing as well as failing to contact those who had obtained it would be a situation "arising from errors in . . . directory listings" as set forth in section 2.4.4(A). Assuming Qwest erred in failing to act, it was clearly an error "arising from" an assertedly incorrect listing a listing that contained the shelter address. Hence, under section 2.4.4(A), Qwest's liability is limited to the "charges for such of the customers [sic] service as is affected during the period covered by the directory in which the error" occurred.

Here, the service in question is the listing in the directory, and SPAN was charged nothing for the listing. Hence, Qwest's liability is zero.

In addition, SPAN's claim is one "by a customer ... for damages associated with the ... provision ... of service" as described in section 2.1.3(A). SPAN argues that the term "service" is limited to the actual telephone service. However, we conclude that "service" in this context does not have so narrow a meaning. Under section 9.1 of the Access tariff, directory assistance is described as a "service," and under section 5.7.1 of the Exchange tariff, the sections dealing with directories are described as "Directory Services" and "Listings Services." SPAN is clearly claiming faults in Qwest's "provision" of directory and listing "services."

Accordingly, under section 2.1.3(A), Qwest's liability is limited to the "proportionate charges for the service for the period during which the service was affected," which we have concluded is zero.

### C.

SPAN contends that Qwest was negligent in September 2003 when Qwest changed the listing to nonpublished but failed to halt the distribution of the other directories and failed to disclose the extent of the listing's dissemination. We conclude that any potential liability is limited by the tariffs.

As previously discussed, even assuming Qwest owed a duty, its liability in this situation would arise "from errors in or omissions of directory listings," and SPAN's claim would be a "claim for damages associated with the provision of service." For the same reasons as previously stated, any potential liability of Qwest would be zero.

### II.

SPAN contends that the trial court erroneously granted summary judgment because there are genuine issues of material fact whether Qwest's actions constituted willful misconduct. SPAN further contends that Qwest did not meet its initial evidentiary burden of proof in its summary judgment motion. We disagree with both contentions.

### A.

In determining whether there is a genuine issue of material fact, we must grant to SPAN all favorable inferences that may be drawn from the undisputed facts, and all doubts as to whether a triable issue of fact exists must be resolved against Qwest. *See Compass Ins. Co. v. City of Littleton, supra,* 984 P.2d at 613.

Even if a filed tariff is applicable to a claim, under section 2.1.3(A) of the tariff, a plaintiff may avoid the limitation on liability if the provider's acts constitute willful misconduct. *See Shoemaker v. Mountain States Tel. & Tel. Co., supra,* 38 Colo.App. at 324, 559 P.2d at 724.

Willful and wanton behavior is defined as "a mental state of the actor consonant with purpose, intent, and voluntary choice." *Shoemaker v. Mountain States Tel. & Tel. Co., supra,* 38 Colo.App. at 324, 559 P.2d at 724. "Willful misconduct consists of conduct purposely committed under circumstances where the actor realizes that the conduct is dangerous but nonetheless engages in the conduct without regard to the safety of others." *United Blood Servs. v. Quintana,* 827 P.2d 509, 523 n. 10 (Colo. 1992); *see also* § 13–21–102(1)(b), C.R.S.2006 (defining willful and wanton conduct as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff").

We first note that any potentially willful conduct on the part of Qwest could have begun only after it was notified that the shelter address was incorrectly being disseminated. Before that time, Qwest was under no duty to determine whether the listing should have been published or sold, and it was acting consistently with the tariffs and federal law.

SPAN points to Qwest's mistakenly referring SPAN to Dex, continuing to disseminate and sell the listing in error, and not notifying those who had the listing to discontinue its dissemination. SPAN argues that this conduct by Qwest can be viewed as willful. We disagree.

Viewing the evidence in the light most favorable to SPAN, we conclude that the facts neither establish nor permit an inference that Qwest's conduct was willful because there is no evidence that Qwest purposely or intentionally referred SPAN to Dex without regard to the safety of others, that Qwest purposely misrepresented who operated directory assistance with knowledge that such a misrepresentation posed a significant risk of harm, or that Qwest acted purposely in any other way with the knowledge that such action carried a substantial risk of harm to SPAN. *See Terror Mining Co. v. Roter*, 866 P.2d 929, 935 (Colo.1994)(summary judgment proper even when willful and wanton conduct alleged, where facts are undisputed and do not establish or imply willful conduct); *Forman v. Brown*, 944 P.2d 559, 564 (Colo.App. 1996) (in reviewing summary judgment, court can find insufficient evidence of willfulness as a matter of law); *see also Castaldo v. Stone*, 192 F.Supp.2d 1124, 1139–42 (D.Colo. 2001)(court determined that alleged actions and omissions did not constitute willful and wanton conduct sufficient to abrogate state governmental immunity). Therefore, the tariffs' liability limitations apply.

### B.

Concerning Qwest's evidentiary burden in its motion for summary judgment, SPAN argues Qwest failed to point to specific portions of the record that demonstrated the absence of material facts concerning the issue of willful misconduct. We conclude that Qwest met its burden.

The burden of establishing the absence of a genuine issue of material fact is on the moving party. *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 712 (Colo.1987). "[T]he moving party bears the initial responsibility of informing the court of the basis for [the] motion and identifying those portions of the record ... which ... demonstrate the absence of a genuine issue of material fact." *Cont'l Air Lines, Inc. v. Keenan, supra*, 731 P.2d at 712. This burden may be satisfied by demonstrating that there is an absence of evidence in the record to support the nonmoving party's case. *Cont'l Air Lines, Inc. v. Keenan, supra*, 731 P.2d at 712.

Here, Qwest submitted an extensive factual record along with its motion for summary judgment. The record contained the tariffs, deposition testimony, responses to interrogatories, and other materials. Qwest also discussed the factual circumstances surrounding SPAN's claims with citations to the record it produced. Later in its motion, Qwest asserted, albeit in a footnote, that SPAN had failed to present any evidence that Qwest's conduct was willful.

We conclude that Qwest satisfied its initial burden to identify those portions of the record that demonstrated the absence of a genuine issue of material fact. Qwest set out the undisputed facts in its motion, provided the trial court with an extensive record supporting those facts, and argued that the facts did not rise to the level of willful misconduct.

In its response, SPAN did not point to anything in the record that, in our view, rises to the level of willful misconduct. *See Cont'l Air Lines, Inc. v. Keenan, supra*, 731 P.2d at 713 ("Once the moving party has met this initial burden of production, the burden shifts to the nonmoving party to establish that there is a triable issue of fact. If the nonmoving party cannot muster sufficient evidence to make out a triable issue of fact ... the moving party is entitled to summary judgment as a matter of law."). Therefore, we reject SPAN's contention that the record and motion produced by Qwest did not meet the required burden.

### III.

SPAN contends that Yellow Book and Verizon owed it a duty to protect against publication of the shelter address and to discontinue distribution of already published directories containing the shelter address. We disagree.

 To prevail on a claim of negligence, a plaintiff must establish the existence of a legal duty, a breach of that duty, causation, and damages. A negligence claim fails where the law imposes no duty on a defendant to act for the plaintiff's benefit. *Keller v. Koca*, 111 P.3d 445, 447 (Colo.2005).

Whether a defendant owes a legal duty in a particular situation is a question of law to be determined by the court. *Keller v. Koca, supra,* 111 P.3d at 448. In determining whether there is a legal duty, courts look to the risk involved, the foreseeability of the injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden on the actor. *HealthONE v. Rodriguez,* 50 P.3d 879, 888 (Colo.2002); *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo.1987). "No one factor is controlling, and the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Taco Bell, Inc. v. Lannon, supra,* 744 P.2d at 46.

In addition, "the law distinguishes between acting and failure to act, that is, misfeasance, which is active misconduct that injures others, and nonfeasance, which is a failure to take positive steps to protect others from harm." *Smit v. Anderson,* 72 P.3d 369, 372 (Colo.App.2002). Generally, a duty is imposed in the nonfeasance situation when "a special relationship exists between the defendant and a third party wrongdoer, or the defendant and the potential victim of the wrongdoer's action." *Perreira v. State,* 768 P.2d 1198, 1208 (Colo. 1989).

Here, we acknowledge the risk involved. Yellow Book and Verizon published the listing in more than 1.3 million telephone directories in the Denver metropolitan area and this publication would have the potential of creating a risk of physical injury for residents and employees at the shelter.

However, we also must consider the foreseeability and likelihood of injury and weigh it against the social utility of the actor's conduct. In our view, it was not foreseeable that a publisher's failure to verify the publishability of information received from Qwest would cause a disclosure of information that would require the injured party to relocate, especially when, as here, Yellow Book and Verizon only requested listings from Qwest that were published.

This lack of foreseeability must be weighed against the social utility in publishing commercial telephone directories. There is obvious social utility in such a business. Indeed, Congress has passed specific legislation to ensure that companies can obtain subscriber list information on a timely basis and at a reasonable rate in order to publish directories. *See* 47 U.S.C. § 222(e).

Next, we must examine the magnitude of the burden of guarding against the injury or harm, and we conclude that the burden on Yellow Book and Verizon would be significant. SPAN's position, if accepted, would require a publisher to identify conceivable types of harm that could potentially flow from the publishing of a simple directory listing, to review thousands of listings to determine which ones could potentially cause harm, and to contact subscribers and verify the information contained in such listings.

SPAN argues that the burden was minimal as demonstrated by procedures Yellow Book formerly had in place. Using these procedures, Yellow Book would contact listings with the following terms in their names: abuse, battered, crisis, domestic, support, shelter, or violence. Yellow Book would then verify whether the listings should be published.

However, even if Yellow Book had used the procedures here, SPAN would not have been contacted, and the listing would have been published in any case, because SPAN's name at the time was "Boulder County Safehouse." Thus, the listing would not have contained any of the search terms. Indeed, SPAN's name currently contains only the word "nonviolence," a term that would not have been found under such a search. SPAN's position would force publishers to pinpoint every conceivable word that could be related to a shelter. Even then, shelters that had chosen a name with totally unrelated terms would be missed.

We must also look to the consequences of placing the burden upon a publisher. Just as the magnitude of the burden on a publisher would be great, the consequences of placing the burden on the publishers would also be significant. Such a burden would require

publishers of commercial directories to correct mistakes made by customers in requesting or failing to request nonpublished service, as well as mistakes made by providers in disseminating the material. We conclude that imposing such a burden would be too onerous, especially because providers can limit their liability for such mistakes in tariffs, but private publishers cannot. It would make little sense to hold downstream publishers liable for publishing information to which they are explicitly entitled under federal law.

Finally, there is no special relationship here that would require the publishers affirmatively to act for the benefit of SPAN. The publishers obtained subscriber information to which they were entitled under federal law and then published it. They had no contractual or other relationship with SPAN.

For the same reasons, we also conclude the factors weigh against imposing a duty on Yellow Book and Verizon to halt distribution of already published directories.

Taking all these factors into consideration, we therefore conclude that Yellow Book and Verizon did not owe a legal duty to SPAN under these circumstances.

In light of the above disposition, we need not consider the remaining contentions of the parties.

The judgment is affirmed.

ROMÁN and ROVIRA *, JJ., concur.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2006.