FILED
United States Court of Appeals
Tenth Circuit

**February 2, 2010**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

APARTMENT INVESTMENT AND
MANAGEMENT COMPANY
(AIMCO),

    Plaintiff-Appellant,

    v.

NUTMEG INSURANCE COMPANY,

    Defendant-Appellee.

No. 08-1150

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 06-CV-00508-WDM-MJW)**

---

Andrew M. Low of Davis Graham & Stubbs LLP, Denver, Colorado, (Thomas L. Roberts and Bradley A. Levin of , Roberts Levin & Patterson, P.C., Denver, Colorado, and Susan Bernhardt and J. Nicholas McKeever, Jr., Netzorg McKeever Koclanes & Bernhardt LLC, Denver, Colorado, with him on the briefs) for Plaintiff–Appellant.

Neil Lloyd (Lisa A. Brown and David C. Scott with him on the briefs), of Schiff Hardin LLP, Chicago, Illinois, for Defendant-Appellee.

---

Before **O'BRIEN**, **McKAY**, and **HOLMES**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

    This case requires us to consider whether, under Colorado law, an insurer

has a duty to defend its insured based on allegations contained in several separate

but factually related complaints. Specifically, the appellant insured appeals the grant of summary judgment in favor of the insurer based on the district court's reading of the individual complaints in conjunction with the insurance policy provisions. Because we believe that the policies underlying Colorado's complaint rule do not allow an insurer to ignore ongoing parallel judicial proceedings which it is aware of and that policy exclusions must be read narrowly, we reverse the district court's grant of summary judgment.

## BACKGROUND

Apartment Investment and Management Company ("AIMCO") is a self-managed real estate investment trust that provides, for a fee, property management services. An essential part of these services is risk management, which entails the selection and procurement of necessary insurance coverage for the managed properties.[1] AIMCO provides these services for properties wholly owned by a subsidiary, properties in which it owns a partial interest, and properties owned by unaffiliated third parties. Nutmeg Insurance Company ("Nutmeg") issued two professional liability policies to AIMCO providing coverage from, respectively, November 20, 2000, to November 20, 2002, and November 20, 2002, to September 1, 2003. In relevant part, these policies

---

[1] During the relevant period AIMCO did not procure individual insurance policies for the properties it managed. Rather, AIMCO created its own program, whereby it purchased insurance from a single insurer using all the managed properties to obtain a favorable rate.

-2-

provided that "[Nutmeg] will pay on behalf of [AIMCO] all sums . . . which [AIMCO] shall become legally obligated to pay as Damages and Claims Expenses resulting from Claims . . . as a result of a Wrongful Act by [AIMCO] or any Entity for whom [AIMCO] is legally liable."[2] (Aptl.App. at 186, 207.) These policies also extended coverage, under certain circumstances, to the "Wrongful Acts" of AIMCO's independent contractors. However, both policies expressly excluded from coverage any claims "for, based upon, or arising from the performance of or failure to perform services as an . . . insurance broker." (Aplt. App. at 197, 221.) In addition, the 2002-2003 policy excludes any claims "for, based upon, or arising from the failure to effect or maintain any insurance or bond." (Aplt. App at 221.)

In connection with its efforts to provide property and risk management services, AIMCO retained an independent contractor to create and manage its insurance program. Under his direction, AIMCO retained and worked with

---

[2] The policies define a "Wrongful Act" as "any actual or alleged act, error or omission in the rendering of or failure to render Professional Services." (Aplt. App. at 189, 210.) "Professional Services," in turn, is defined as "those services set forth in Item 7 of the declarations requiring special learning or intellectual skill, performed by [AIMCO] in the ordinary conduct of its profession for others for a fee, remuneration or other consideration . . . ." (Aplt. App. at 189, 210.) Item 7 of the declarations states, "Professional Services: solely in the performance of providing professional services as a real estate agent/broker, property manager, asset manager, loan services and administrator, risk manager, insurance administrator, real estate investment advisor, tax fund management for others for a fee." (Aplt. App. at 206.)

several brokers and firms in placing the property and general liability insurance, as well as arranging financing for those policies. However, at least one of these brokers, allegedly without AIMCO's knowledge, used AIMCO's program as part of a Ponzi scheme by adding unaffiliated companies to the policies and then retaining their premiums, as well as by using these companies to fraudulently obtain additional premium financing.

Within a year of the scheme's discovery, AIMCO had been sued as a defendant or counterclaim defendant by: a lender that provided funds through premium finance agreements ("PFAs") AIMCO used to pay for the policies,[3] companies that provided surety bonds guaranteeing the PFAs,[4] one of the property insurers,[5] an insurance broker,[6] and two unaffiliated entities improperly added onto AIMCO's policy.[7] Several of these suits alleged either AIMCO's direct

---

[3] *Cananwill, Inc. v. AIMCO*, No. MRS-L-3549-02 (N.J. Super. Ct. Law Div. filed Nov. 13, 2002).

[4] *WestRM–West Risk Markets, Ltd. v. Lumbermans Mut. Cas. Co.*, No. 02-cv-7344 (S.D.N.Y. claims against AIMCO filed Nov. 22, 2002); *Lumbermans Mut. Cas. Co. v. AIMCO*, No. 02–cv-9704 (S.D.N.Y. filed Dec. 6, 2002); *Highlands Ins. Co. v. Cananwill, Inc.*, No. MRS-L-1874-03 (N.J. Super. Ct. Law Division filed July 11, 2003).

[5] *AIMCO v. Nat'l Union Fire Ins. Co.*, No. 01-cv-2018 (D. Colo. claims by Nat'l Union against AMICO filed Oct. 23, 2003).

[6] *Id.* (claims by First Capital against AIMCO filed Sept. 13, 2003).

[7] *Basic Capital Mgmt., Inc. v. AIMCO*, No. 03-9530 (Tex. 68th Jud. Dist. filed Sept. 12, 2003).

involvement with the scheme or liability for the actions of AIMCO's independent contractor. Upon receiving notice of these suits, AIMCO contacted Nutmeg to provide its defense under the professional liability policies. Nutmeg declined based on its position that none of the complaints alleged "Wrongful Acts" as covered by its policies.

AIMCO brought suit in Colorado state court claiming Nutmeg breached its duty to defend. Nutmeg removed the case to the district court based on diversity. AIMCO's partial motion for summary judgment on the issue of the duty to defend was referred to a magistrate judge for consideration. The magistrate judge examined each complaint—together with the insurance policies—separately and ultimately determined Nutmeg owed a duty to defend four of the seven lawsuits based on the allegations contained in the individual complaints. Both parties filed objections to the recommendation. Additionally, Nutmeg filed its own motion for summary judgment on all claims and, in the alternative, a partial motion for summary judgment on AIMCO's claims under the 2000-2002 policy.

The district court, like the magistrate judge, examined each complaint separately and limited its analysis to comparing the allegations individually with the insurance policies. The court determined two of the complaints did not allege any covered conduct and the other five were excluded from coverage under the policies' insurance broker exclusion. Upon finding no duty to defend, the district court dismissed AIMCO's remaining claims, including indemnification and bad

faith breach of an insurance contract, and denied all other pending motions as moot.

**DISCUSSION**

We review the district court's grant of summary judgment de novo, using the same legal standard applied by the district court. *Cooperman v. David*, 214 F.3d 1162, 1164 (10th Cir. 2000). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Colorado law governs this action, and we review de novo the district court's interpretation of Colorado law. *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1108-09 (10th Cir. 2002).

Under Colorado law, "when an insurer refuses to defend and the insured brings an action for defense costs," the duty to defend is determined by application of the complaint rule. *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 828 (Colo. 2004). Under this rule, a duty to defend arises when the underlying complaint "alleges any facts that might fall within the coverage of the policy." *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1089 (Colo. 1991). The insured's actual liability is not considered; instead, the duty is based on "allegations in the complaint, which if sustained, would impose a liability covered by the policy." *Id*. This duty arises even when it is "not apparent from the

-6-

pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded." *Id.* (internal quotation omitted). An insurer seeking to avoid its duty faces a "heavy burden" of proving that the underlying claim cannot fall within the policy coverage. *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 614 (Colo. 1999).

The existence of a duty to defend against a particular claim is a question of law. *See Flannery v. Allstate Ins. Co.*, 49 F. Supp. 2d 1223, 1227 (D. Colo. 1999). In determining the existence of a duty to defend, the court must compare the allegations of the underlying complaint with the relevant provisions of the insurance policy. *See Hecla*, 811 P.2d at 1089. However, throughout the course of this litigation, the parties have disputed whether, under Colorado law, a court may also consider evidence outside the complaints in making this determination. Specifically, AIMCO argues, while the Colorado Supreme Court has held that an insurer cannot introduce extrinsic evidence to avoid its duty to defend, the court has never addressed whether an insurer can disregard its knowledge of facts creating a duty to defend when those facts are not alleged in the underlying complaint. In response, Nutmeg argues the Colorado Supreme Court has clearly stated that in all cases an insurer's duty to defend arises only from the *bona fide* allegations contained in the underlying complaint together with the provisions of

the insurance policy, except where an insurer provides a defense under a reservation of rights.

The Colorado Supreme Court has issued three principal cases concerning the duty to defend: *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083 (Colo. 1991); *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606 (Colo. 1999); and *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814 (Colo. 2004). However, after reviewing these cases, we conclude the court has not addressed the specific issue raised in this case; namely, whether an insurer, in determining its duty to defend, can disregard its knowledge of facts outside an individual complaint but contained in related complaints and known to the insurer. In *Hecla* the court considered whether an insurer that refused to defend could use facts extrinsic to the underlying complaint to avoid its duty to defend. *Hecla*, 811 P.2d at 1088-90. Citing concerns an insured would be required to establish facts that could then compromise it in later proceedings, the court held an insurer was limited to consideration of the allegations in the underlying complaint in showing no duty exists. *Id.* at 1089 n.10, 1090. Similarly, *Cotter* addressed the same issue and restated the court's ruling from *Hecla* that an insurer refusing to defend "must rely solely on the allegations contained in the complaint" to dispute the existence of its duty. *Cotter*, 90 P.3d at 827. Finally, in *Compass*, the court considered whether an insured, rather than an insurer, could rely on extrinsic facts to establish a duty to defend, and found it could not. *Compass*, 984 P.2d at 615-16.

-8-

However, in *Compass* there is no indication the insurer was aware of this evidence at the time it refused to defend or, as in this case, the relevant facts were alleged in parallel judicial proceedings. Thus, because the Colorado Supreme Court has not addressed this specific issue, we "must determine what decision the state court would make if faced with the same facts and issue." *Rash v. J.V. Intermediate, Ltd.*, 498 F.3d 1201, 1206 (10th Cir. 2007) (internal quotation omitted). In making this determination, we rely on our decision in *Pompa v. American Family Mutual Ins. Co.*, 520 F.3d 1139 (10th Cir. 2008).

In *Pompa*, we addressed whether, under Colorado's complaint rule, a court could consider the extrinsic fact of an insured's conviction which was not alleged in the underlying complaint but would demonstrate the insurer had no duty to defend. *Id.* at 1145. We acknowledged that ordinarily the complaint rule limits consideration to "solely the policy and the complaint." *Id.* Nevertheless, we held the Colorado Supreme Court would likely "recognize an exception" because such an exception (1) would not "undercut the purposes" underlying the rule, and (2) would be supported by sufficient authority. *Id.* at 1147. Accordingly, we apply this same test to determine whether an insurer can ignore facts alleged in parallel judicial proceedings of which it is aware at the time it refuses to defend an insured and that give rise to a duty to defend.

The Colorado Supreme Court has stated the complaint rule serves two purposes. The first purpose served by the complaint rule is to "protect[] the

-9-

insured's 'legitimate expectation of a defense.'" *Cotter*, 90 P.3d at 828 (quoting *Hecla*, 811 P.2d at 1090). The *Hecla* court explained that requiring insureds to bear the "burden of proving they are entitled to a defense from liability claims asserted against them would deny the insured the protection afforded by the liability policy." *Hecla*, 811 P.2d at 1090 n.11. Rather, "[b]y purchasing insurance, the insured reasonably expects he will not be required to furnish the cost of defending actions that facially fall within the terms of his policy." *Cotter*, 90 P.3d at 828. In essence the first purpose of the rule is to protect the "peace of mind that insurance promises" for claims made against an insured possibly falling under the policy's terms. *Pompa*, 520 F.3d at 1146.

Considering this purpose in light of the case before us, we conclude that an exception to the complaint rule requiring an insurer to consider facts which it is aware of in parallel complaints that tend to show a duty to defend would not undercut an insured's legitimate expectation of a defense. If anything, such an exception protects an insured's interest. Indeed, to hold otherwise would turn this purpose on its head by allowing an insurer to use the complaint rule to refuse a defense it knows it has a duty to provide simply because certain facts pled in factually-related complaints are not pled in the particular complaint at issue. The complaint rule was never meant to be used by insurers as a shield in order to avoid a legitimate duty to defend.

The second purpose served by the complaint rule is to prevent an insurer or

-10-

an insured, while litigating the duty to defend in a declaratory judgment action, from compromising the insured's defense in the underlying suit. *See Hecla*, 811 P.2d at 1089 n.10. Specifically, an insured, in an effort to "establish coverage under the policy, might have to produce evidence in the declaratory-judgment action that would subject it to liability in the underlying action." *Pompa*, 520 F.3d at 1146; *see also Hecla*, 811 P.2d at 1090 n.10 (explaining how the defense could be compromised). This purpose remains even when an insurer simply refuses to defend without bringing a declaratory action and the insured sues for reimbursement after the underlying action has been settled. Even though there is no longer a danger of compromising the insured's defense, the complaint rule ensures that there is no "incentive for insurers to refuse to defend in the hope that [the underlying] litigation will reveal that no duty to defend exists." *Cotter*, 90 P.3d at 828.

As with the first purpose advanced by the complaint rule, we think an exception requiring an insurer, in determining its duty, to consider facts alleged in related complaints that it is aware of, but that are outside the complaint directly at issue, will not undermine the second purpose. Under this exception, it is not necessary for an insured to establish facts through discovery or other means; instead, these facts are already known to the insurer and should have been considered. Thus, there will be no prejudice. Additionally, even if an insured is forced to litigate whether these facts were known to the insurer, the insured would

-11-

not have to establish these facts are true. Rather, as in this case, the insured would simply have to show the insurer was aware of alleged facts outside the complaint that potentially or arguably place a claim within the policy's coverage (whether or not, as with consideration of the allegations of the actual complaint, those facts are ultimately true or false).

Having thus considered the purposes underlying Colorado's complaint rule, we now turn our consideration to the second requirement from *Pompa*; namely, whether there is sufficient authority to support this approach. The generally accepted rule on this issue by those states that have considered it seems to be that, if at the time an insurer determines whether it has a duty to defend, the insurer is aware of "information from which it appears that there might be coverage for any of the damages sought from the insured, [it] has a duty to defend even if the allegations of the complaint themselves would not give rise to such a duty." 1 Allan D. Windt, *Insurance Claims & Disputes* (5th ed. 2007) § 4:3 at 4-71 to 4-73 (see supporting cases cited at 4-71 n. 1 and 4-73 n. 2); *see also, e.g., First Bank of Turley v. Fid. & Deposit Ins. Co. of Md.*, 928 P.2d 298, 303-04 (Okla. 1996) ("The insurer's defense duty is determined on the basis of information gleaned from the petition (and other pleadings), from the insured and from other sources available to the insurer at the time the defense is demanded . . . .") (emphasis and footnote omitted); *Spivey v. Safeco Ins. Co.*, 865 P.2d 182, 188 (Kan. 1993) (stating an insurer determines the existence of a duty to defend by

"examining the allegations in the complaint or petition and considering any facts brought to its attention or which it could reasonably discover"); *Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 799 P.2d 1113, 1116 (N.M. 1990) (stating the duty to defend "arises from the allegations on the face of the complaint or from the known but unpleaded factual basis of the claim that brings it arguably within the scope of coverage"); *but see St. Paul Ins. Co. v. Rahn*, 641 S.W.2d 276, 279 (Tex. App. 1982) (holding that the insurer can determine its duty to defend "based wholly on the allegations contained in the pleadings filed against its insured"). Indeed, "[t]he logic behind this rule is unassailable. An insurer should not be able to escape its defense obligation by ignoring the true facts and relying on either erroneous allegations in the complaint or the absence of certain material allegations in the complaint." Windt, *supra* at 4-74. Given this authority, we believe the Colorado Supreme Court would approve of an exception to the complaint rule requiring an insurer to consider the allegations in parallel judicial proceedings, of which it is aware, arising from a common core of operative facts. This is particularly so given that this authority, and our decision in *Pompa*, actually support requiring an insurer to consider evidence not contained in any complaint—a broader version of the exception than we apply today.

Additionally, the actual practices of the Colorado Supreme Court in duty-to-defend cases provide further support for the application of an exception in this case. For example, in *Cotter* the court considered two underlying tort suits filed

-13-

by different sets of plaintiffs but involving a common core of operative facts. *Cotter*, 90 P.2d at 818. In its analysis the court did not consider the allegations in each complaint separately; instead, the court considered both complaints together to determine if there were any allegations giving rise to the duty to defend. *See id.* at 829-30. Similarly, in *Hecla* the court, in its determination of the insurer's duty to defend, did not differentiate between the allegations contained in a third-party complaint against the insured and the original complaint filed against the insured by the State. *See Hecla*, 811 P.2d at 1092. Finally, in *Compass* the court's analysis considered letters, which it analogized to complaints, sent to two different cities together rather than separately to determine that an insurer had a duty to defend. *See Compass*, 984 P.2d 615-16. After considering the two requirements we previously laid out in *Pompa* and the Colorado Supreme Court's analysis in its duty-to-defend cases, we now hold that an insurer cannot view the allegations contained in a single complaint in isolation when it is aware multiple complaints arising from a common core of operative facts have been filed against the insured. Rather, the insurer must consider such complaints in conjunction to make a good faith determination of its duty to defend.

We now turn to the application of this exception in the case before us. It is undisputed the complaints at issue in this case arose from a "common core of operative facts." (Aplt. App. at 1342.) Indeed, the complaints were filed within a year of one another, implicated the same defendants, and often included

-14-

references to the parties involved in the other lawsuits and to the same factual occurrences. That Nutmeg was aware these complaints were related is revealed not only by its initial denial-of-coverage letter (which addressed three of the underlying complaints), but also by subsequent denial letters making reference to other complaints, as well as in Nutmeg's own internal memoranda. Thus, we are left only to consider whether the complaints, when considered together, potentially or arguably allege an "act, error or omission" in providing or failing to provide professional services "for others for a fee."[8] (Aplt. App. at 189, 210.) This includes services "as a real estate agent/broker, property manager, asset manager, loan services and administrator, risk manager, insurance administrator, real estate investment advisor, [or] tax fund manage[r]." (Aplt. App. at 206.)

After examining the complaints, we agree with the magistrate judge's determination that four of the complaints included language that "arguably" alleged the provision of professional services by AIMCO as a property manager or insurance administrator, and we note that two of these four complaints were among the first three complaints denied by Nutmeg. As for the other complaints, after examining the complaints taken together, we are satisfied they contained sufficient information to provide Nutmeg with reasonable notice that these suits

---

[8] Although the parties have previously disputed the meaning of "Professional Services" as defined by the policies, they have not raised this issue before this court. Thus, we adopt the analysis employed by the magistrate judge and adopted by the district court, which we hold to be correct.

-15-

"might fall within coverage of the policy," *Hecla*, 811 P.2d at 1089.

We must now consider whether Nutmeg was, nevertheless, excused from providing a defense based on two exclusions contained in the policies. An insurer attempting to avoid its duty to defend based on an exclusion "bears the burden of establishing that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy." *Cotter*, 90 P.3d at 829 (internal quotation omitted). "Coverage provisions in an insurance contract are to be liberally construed in favor of the insured to provide the broadest possible coverage." *Tepe v. Rocky Mountain Hosp. & Med. Servs.*, 893 P.2d 1323, 1328 (Colo. Ct. App. 1994) (internal quotation omitted). In contrast, because an insurer has "affirmatively expressed coverage through broad promises," limitations on that coverage must be defined in "clear and explicit terms." *Hecla*, 811 P.2d at 1090 (discussing *Koncilja v. Trinity Universal Ins. Co.*, 528 P.2d 939, 941 (Colo. Ct. App. 1974), in a parenthetical). Ambiguous provisions are "construed against the drafter and in favor of providing coverage." *Compass*, 984 P.2d at 619 (internal quotation omitted). A provision is ambiguous when it "is reasonably susceptible to different meanings." *Id*. (internal quotation omitted).

First, we consider the policy provision excluding coverage for any services that AIMCO may provide as an "insurance broker." Nutmeg argues this exception precludes coverage because, under the allegations in the complaints, AIMCO was "procuring" and "obtaining" insurance for third parties, thus

"performing the services of an insurance broker and not a risk manager or insurance administrator." (Aple Br. at 51.) In support of this interpretation, Nutmeg cites to the Black's Law Dictionary's definition of an insurance broker as "[a] person who, for compensation, brings about or negotiates contracts of insurance as an agent for someone else, but not as an officer, salaried employee, or licensed agent of an insurance company. The broker acts as an intermediary between the insured and the insurer." *Black's Law Dictionary* 206 (8th ed. 2004). However, we believe that Nutmeg's interpretation of this exclusion is too broad, especially in light of the fact that AIMCO specifically negotiated coverage for providing professional services as a "property manager," "risk manager," and "insurance administrator." These terms—like the term "insurance broker"—are not defined in the policies and, in light of Colorado's policy of construing coverage broadly, could include AIMCO's procurement of insurance for the properties it manages.

Additionally, in considering whether AIMCO's alleged conduct should be deemed as providing services as an "insurance broker," we note that Nutmeg has omitted a portion of the Black's Law Dictionary explanation stating that "almost all insurance brokers are actually compensated for their services through commissions that are paid by insurers." *Id.* (internal quotation omitted). Another of Nutmeg's cited sources states that "[insurance] brokers–like agents–are statutorily deemed to be representing the insurers' interest." 7A John

W. Grund et al., *Colorado Practice* § 43.2 (2d ed. 2006). There are no allegations

in the underlying complaints that AIMCO was working as an agent for the insur-

ance companies or that it received a commission in connection with its insurance

services. Finally, we think it is significant that Colorado's licensing statute gov-

erning "insurance producers"[9] expressly excludes "[m]anagement associations . . .

whose operations do not entail solicitation of insurance from the public" from its

definition of insurance producers. C.R.S. § 10-2-105(2)(f) (2009). In light of the

above-cited authorities and the fact that Nutmeg did not define the term

"insurance broker," we hold that this exclusion did not excuse Nutmeg from its

duty to defend.

Having considered the first policy exclusion at issue, we now turn our

attention to the second exclusion, found only in the 2002-2003 policy, which

excuses Nutmeg from a duty to defend against claims "arising from the failure to

effect or maintain any insurance." (Aplt. App. at 221.) Colorado courts have

found that similar exclusions can relieve an insurer of its duty-to-defend claims

made against property management companies by their clients for a breached

promise to provide insurance. *See Mgmt. Specialists v. Northfield Ins.*, 117 P.3d

32, 35-36 (Colo. App. 2004) (construing a similar exclusion to exclude coverage

---

[9] "Insurance producer" is a common synonym for "insurance broker." *See e.g.*, *Black's Law Dictionary* 206 (8th ed. 2004) (stating that "insurance broker" is "[a]lso termed *producer*"); 7A Grund, *supra* § 43.2 (using "insurance producer" and "broker" synonymously).

of claims made for "failure to maintain insurance"). However, this exclusion is inapplicable to this case. The underlying complaints allege wrongful acts resulting from AIMCO's efforts to provide professional services for others for a fee, not its failure to do so. None of the complaints were brought by AIMCO's clients alleging a failure to provide or maintain insurance. Thus, we conclude, like the insurance broker exclusion, this exclusion does not relieve Nutmeg of its duty to defend AIMCO in the underlying lawsuits.

Finally, Nutmeg has argued on appeal that if we reverse the district court's grant of summary judgment we should, in the alternative, grant its motion for partial summary judgment on the 2000-2002 policy. We decline to do so here because it appears that the district court has not ruled on a significant motion involving a portion of the evidence on which Nutmeg's motion relies. Ruling on this motion now would deprive AIMCO of "a fair opportunity to develop the record" on this issue. *Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1324 (10th Cir. 2007). Nutmeg also argues it is entitled to summary judgment on AIMCO's indemnity and bad faith claims. However, because these issues have not been ruled on by the district court we will leave them to the district court on remand. *Evers v. Regents of Univ. of Colo.*, 509 F.3d 1304, 1310 (10th Cir. 2007) (holding that the better practice on issues raised but not ruled on by the district court is to "leav[e] the matter to the district court in the first instance").

For the foregoing reasons we **REVERSE** the district court's grant of

summary judgment and **REMAND** for further proceedings not inconsistent with this opinion.