2012 COA 54

**COLORADO DIVISION OF INSURANCE, Petitioner–Appellee,**

v.

**Milton Michael TRUJILLO, Insurance Producer with Bail Bond Authority, License No. 60267, Respondent–Appellant.**

No. 11CA0622.

Colorado Court of Appeals, Div. I.

March 29, 2012.

As Modified on Denial of Rehearing Aug. 2, 2012.

John W. Suthers, Attorney General, Todd S. Larson, First Assistant Attorney General, Denver, Colorado, for Petitioner–Appellee.

Lee N. Sternal, P.C., Lee N. Sternal, Pueblo, Colorado, for Respondent–Appellant.

Opinion by Judge TAUBMAN.

¶ 1 In this case concerning the fiduciary duties owed by a bail bonding agent to his

client, respondent, Milton Michael Trujillo, appeals the final order of petitioner, the Colorado Division of Insurance (Division), affirming the initial decision of the agency's administrative law judge (ALJ) to revoke and deny his application for renewal of his bail bonding agent and insurance producer licenses.[1] We affirm.

## I. Background

¶ 2 In December 2004, Connie Espinoza gave Trujillo, a licensed bail bonding agent and insurance producer, $3,500 in cash to post bond for her son. Although Trujillo did not provide Espinoza with a formal receipt, he wrote on the back of a business card that he had received $3,500 from Espinoza on that date "for Ted Espinoza's bond" and signed his name.

¶ 3 Trujillo was unable to post bond for Espinoza's son, however. Rather, on the same day he received the premium from Espinoza, he gave Connie Cordova, an acquaintance of Espinoza's son, $2,360—the $3,500 less $1,140 used to post a bond for Cordova's friend. Trujillo did not immediately advise Espinoza of, and Espinoza did not otherwise consent to, this transaction.

¶ 4 Several months later, Espinoza sent the Division a letter in which she complained that Trujillo refused to credit $3,500 to her and "still [had] [her] money."

¶ 5 Although the Division took no immediate action, it filed a complaint against Trujillo in March 2009. It also denied Trujillo's application for renewal of his licenses in April 2009, thereafter amending the complaint to include facts concerning the application denial.

¶ 6 A two-day hearing on the matter was held in late September 2010 before an ALJ. Witnesses testified that Connie Cordova had given Espinoza at least part of the $3,500, but differed as to whether Cordova owed or merely lent the money to Espinoza's son. Espinoza herself testified that the total amount came from cashing Cordova's money orders.

¶ 7 In closing argument, Trujillo contended that, because the $3,500 premium Espinoza gave to him was actually Cordova's, Cordova was entitled to the money; therefore, returning it to her and not Espinoza was proper under the statutory scheme.

¶ 8 Ultimately, the ALJ found Trujillo liable on nine of the twelve counts the Division brought against him and ordered his licenses revoked and applications for renewal denied.

¶ 9 Upon Trujillo's notice of exceptions to the initial decision, the Division adopted the ALJ's initial decision except as to the evidentiary finding of fact that "the original source of the $3,500 is not clear from the record." This appeal followed.

## II. Breach of Fiduciary Duties

¶ 10 Trujillo contends the Division erred in denying renewal of his insurance producer and bail bonding agent licenses because the agency misinterpreted section 10-2-704, C.R.S.2011, when it determined that he owed a fiduciary duty to Espinoza and should not have returned the bond premium to Cordova.[2] We disagree.

---

1. An "insurance producer" is often synonymous with an "insurance broker." *Apartment Inv. & Mgmt. Co. (AIMCO) v. Nutmeg Ins. Co.*, 593 F.3d 1188, 1197–98 & n. 9 (10th Cir.2010) (applying Colorado law); *Black's Law Dictionary* 206 (9th ed. 2009) ("insurance broker" is "[a]lso termed producer").

2. Although Trujillo asserts in a cursory fashion that this erroneous determination serves as the basis for all nine of the ordered sanctions against him, the People disagree. Rather, they maintain that the Division's findings concerning to whom Trujillo owed a fiduciary duty determined only five of the nine counts. The remaining four counts concerned Trujillo's failure to comply with reporting and receipt issuance requirements

under sections 12-7–105 and –108, C.R.S.2011, and the Division's regulations. We agree with the People. Because Trujillo has not otherwise articulated arguments to support vacating these four charges, we do not address them on appeal. *See People v. Cooper*, 205 P.3d 475, 477 (Colo. App.2008) (refusing to consider argument which defendant failed to support with authority or adequately articulate). Nor do we construe Trujillo's failure to specifically contest these four charges as dispositive of his appeal. Because the four charges concerned record-keeping violations that were less significant than the breach of fiduciary duty and misappropriation charges, the Division might not have suspended and refused to renew Trujillo's licenses solely on those grounds. *See* § 12–7–106(1), C.R.S.2011 ("[D]i-

## A. Standard of Review

■ ¶ 11 The Colorado Administrative Procedure Act (APA), section 24–4–106(7) and (11)(e), C.R.S.2011, governs our review. We may only reverse the decision of an administrative agency if we find the agency acted arbitrarily or capriciously, made a decision unsupported by the record, erroneously interpreted the law, or exceeded its authority. *Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1247 (Colo.2001).

■ ¶ 12 Where the decision under review concerns the agency's interpretation of regulations and statutory provisions, we review the interpretation de novo because our review of such questions is a matter of law. § 24–4–106(7). However, "we accord deference to the interpretation of a statute or regulation by the agency charged with its administration" and generally accept the agency's interpretation if it has a reasonable basis in the law and is warranted by the record. *Nededog v. Colorado Dep't of Health Care Policy & Financing*, 98 P.3d 960, 962 (Colo.App.2004); *see also City of Commerce City v. Enclave W., Inc.*, 185 P.3d 174, 178 (Colo.2008).

■ ¶ 13 A court reviewing an interpretation of a statute by an agency must apply a two-part test. *Mile High Greyhound Park, Inc. v. Colorado Racing Comm'n*, 12 P.3d 351, 353 (Colo.App.2000). The court first must determine if the legislature has directly spoken to the precise question at issue. If the intent is clearly articulated in the statute, the court is required to give effect to such unambiguously expressed intent. *Id.*

¶ 14 However, if the statute is silent or ambiguous with respect to the specific issue, the inquiry becomes whether the agency's interpretation is based on a permissible construction of the statute. *Id.* When the statute is silent as to the issue to be determined, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 353–54 (quoting *Wine & Spirits Wholesalers of Colorado, Inc. v. Colorado Dep't of Revenue*, 919 P.2d 894, 897 (Colo.App.1996)).

■ ¶ 15 In reviewing the agency's construction, we rely on the basic rules of statutory construction, affording the language of the provisions at issue their ordinary and common-sense meaning. *Wash. County Bd. of Equalization v. Petron Dev. Co.*, 109 P.3d 146, 149 (Colo.2005); *Colorado State Pers. Bd. v. Dep't of Corr.*, 988 P.2d 1147, 1150 (Colo.1999).

## B. Analysis

¶ 16 Bail bonding agents are licensed and regulated by the Division pursuant to statutes contained in titles 10 and 12 of the Colorado Revised Statutes. *See, e.g.,* §§ 10–2–104, –401, –704, –801, C.R.S.2011; §§ 12–7–101 to –113, C.R.S.2011. A bail bonding agent comes under the ambit of article 2 of title 10, the "Colorado Producer Licensing Model Act," as an "insurance producer." The term connotes, as relevant here, "a person who solicits, negotiates, effects, procures, delivers, renews, continues, or binds ... [p]olicies of insurance for risks residing, located, or to be performed in [Colorado]." § 10–2–103(6)(a), C.R.S.2011. An insurance producer may be licensed in one or more lines of authority, including bail bonding agent authority. § 10–2–407(1)(f), C.R.S.2011 (such authority includes bonding as a surety agent, a cash bonding agent, and a professional cash bail agent). Such authority differs widely from the authority to broker life or property insurance. Nonetheless, title 10 applies to all types of insurance.

¶ 17 The General Assembly provides additional direction to the Division concerning bail bonding agents' responsibilities in article 7 of title 12. § 12–7–102(3), C.R.S.2011. Pursuant thereto, the Division has the authority to promulgate and enforce rules concerning licensing, notice, reporting and record-keeping requirements, qualification bonds, forfeiture procedures, appropriate fees, and license revocation and other penalties.

¶ 18 Here, the ALJ found that Trujillo violated provisions of both title 10 and title

---

vision shall deny, suspend, revoke, or refuse to renew, *as may be appropriate,*" a bail bonding agent's license for knowingly violating Division rules or regulations).

12, as well as the Division's implementing regulations. This appeal focuses on the ALJ's finding that he violated section 10–2–704(1)(a), C.R.S.2011, and Division of Insurance Regulation 1–2–1, 3 Code Colo. Regs. 702–1. Section 10–2–704(1)(a) states in relevant part:

All premiums belonging to insurers and all unearned premiums belonging to insureds received by an insurance producer licensee under this article shall be treated by such insurance producer in a fiduciary capacity.

Regulation 1–2–1 section 4(B), promulgated under the authority of section 10–2–704, provides: "Upon receipt, the insurance producer or agency shall treat all premiums and returned premiums in a fiduciary capacity. . . ."

¶ 19 In determining that Trujillo violated the statute and regulation, the ALJ made two findings of fact regarding the fiduciary relationship between Espinoza and Trujillo.

First, Finding 4 stated:

[In December 2004,] Connie Espinoza gave the Respondent $3,500 to use to bond her son Ted Espinoza out of jail. A fiduciary relationship was thereby created between the Respondent and Ms. Espinoza to use the money for this purpose.

The second sentence of Finding 4 is a finding of ultimate fact because it is a mixed conclusion of law and fact that determines the rights and liabilities of the parties. *Samaritan Inst. v. Prince–Walker*, 883 P.2d 3, 9–10 (Colo.1994) (holding that an agency is not bound by an ALJ's finding of ultimate facts as long as the agency's determination has a reasonable basis in the law and is supported by substantial evidence in the record).

Second, Finding 21 stated:

The ALJ finds as a fact that the Respondent had a fiduciary duty to Ms. Espinoza to use the money entrusted to him on the bond for her son. Even if he believed the money originally came from Connie Cordova, he was required to return it to [Ms. Espinoza] since he did not post the bond. He had no authority to allow Ms. Cordova to use the money for [her friend's] bond or to keep the remainder.

¶ 20 This finding also constitutes a finding of ultimate fact because it determines the parties' rights and liabilities. *Id.*

¶ 21 The Division adopted these findings and concluded that Trujillo failed to treat the $3,500 in a fiduciary capacity, violating section 10–2–704(1)(a) and Regulation 1–2–1. Ultimately, these findings supported counts one, two, three, four, and seven. These counts, respectively, are as follows: (1) violation of fiduciary duty under section 10–2–704(1)(a) and Regulation 1–2–1; (2) misappropriation under section 10–2–801(1)(e), C.R.S.2011; (3) "commission of unfair trade practice or fraud" under section 10–2–801(1)(h), C.R.S.2011; (4) use of fraudulent practices under section 10–2–801(1)(h), C.R.S.2011; and (5) violation of section 12–7–109(1)(*o*), C.R.S.2011, which requires return of all moneys within forty-eight hours of failing to post a bond.

¶ 22 Trujillo argues that the Division misinterpreted section 10–2–704 in concluding that he had a fiduciary duty to Espinoza. We disagree.

■ ¶ 23 Trujillo maintains that the division's interpretation contravenes section 10–2–704(1)(c), C.R.S.2011, which provides:

All returned premiums received from insurers or credited by insurers to the account of the licensee shall be remitted to or credited to the account of the person entitled thereto within thirty days after such receipt or credit.

¶ 24 Trujillo argues that the phrase "person entitled thereto" means that he established a fiduciary relationship with Cordova, rather than Espinoza, and the statute required him to remit the money to Cordova, whom he allegedly knew to be its owner.

¶ 25 Contrary to Trujillo's contention, however, section 10–2–704(1)(c) does not apply here because an insurer is not involved. Under the statutory scheme, an insurer "engag[ing] . . . in the business of *making* contracts of insurance" is distinguished from an "insurance producer" who negotiates and procures insurance policies. *Compare* § 10–2–103(6.5), C.R.S.2011, *with* § 10–2–103(6); *see* § 10–2–105(1), C.R.S.2011 ("Nothing in this article shall be construed to require an

insurer to obtain an insurance producer license.”); *see also* § 10–2–704(1)(a) (describing how insurance producers should treat “premiums belonging to insurers and unearned premiums belonging to insureds”). Further evincing the legislative intent to distinguish insurers from insurance producers is the provision permitting a bail bonding insurance producer to solicit business on behalf of an insurer only if the insurer has notified the Division, and to do so as an agent of the insurer only under the terms of an express contract. § 10–2–415.5, C.R.S.2011.

Here, evidence was presented to the ALJ that Trujillo was unable to procure a power of attorney from the insurer with whom he usually dealt to post a bond for Ted Espinoza. Accordingly, because Trujillo was not acting on behalf of an insurer nor transmitting premiums to or from an insurer, section 10–2–704(1)(c) is inapplicable.

¶ 26 Nevertheless, Trujillo alternatively contends that section 10–2–704(1)(a) requires the same result; he maintains that his fiduciary duties extended to Cordova, rather than to Espinoza, because the unearned bail bond premium he received from Espinoza “belong[ed]” to Cordova. Under this section, “all unearned premiums belonging to insureds received by an insurance producer licensee” must be treated in a fiduciary capacity. The Division disagreed.

¶ 27 Applying this provision here, we conclude that Ted Espinoza is the “insured” under section 10–2–704(1)(a) because Trujillo undisputedly received the $3,500 to procure for him a surety bond, a type of insurance under title 10. *See also* Regulation 1–2–1 § 4(A) (noting that premiums received by insurance producer for the issuance of, as well as the *application* for, an insurance policy must be treated in a fiduciary capacity). Because Trujillo was then unable to post a bond on his behalf, any premium received by Trujillo was thus “unearned.” When Connie Espinoza acted on behalf of her son in remitting the premium to Trujillo, she stood in the shoes of the “insured”—her son Ted—as his agent. *See, e.g., Citywide Banks v. Armijo*, 313 P.3d 647, 652 (Colo. App.2011) (principal may be bound by agent’s actions if agent acts pursuant to either actual or apparent authority); *Moffett v. Life Care Centers*, 187 P.3d 1140, 1144 (Colo.App.2008) (agent “stands in the shoes of the principal” in agent-principal relationship), *aff’d*, 219 P.3d 1068 (Colo.2009).

¶ 28 In concluding that Trujillo established a fiduciary relationship with Connie Espinoza under section 10–2–704(1)(a), the Division implicitly interpreted the statutory phrase “belonging to” as referring to the person who physically possessed the premium before transmitting it to the insurance producer. *See also* Regulation 1–2–1 § 4(B)(1) (“Upon *receipt* [of a premium] the insurance producer … must treat all premiums and return premiums as trust funds....”) (emphasis added). It also construed a fiduciary relationship as commencing when the bail bonding agent received money to post a bond.

¶ 29 Thus, the Division interpreted section 10–2–704(1)(a) to mean that the $3,500 premium belonged to Connie Espinoza as agent for her son Ted, and that it became an unearned premium when Trujillo was unable to post a bond. Once it was clear that the premium was unearned, Trujillo had a statutory obligation to treat it in a fiduciary capacity.

¶ 30 In reviewing this interpretation, we look first to any unambiguous intent expressed by the General Assembly in the statute. *Mile High Greyhound Park, Inc.*, 12 P.3d at 353. However, this statute does not provide clear guidance as to whether a bail bonding agent must return any unearned premium to the person who gave him or her money to post a bond or to the legal owner of such money, in the event they are different.

¶ 31 Accordingly, we must determine whether the Division’s interpretation is based on a permissible construction of the statute. *Id.*

¶ 32 We ordinarily construe statutory terms according to their common usage. *See Klinger v. Adams County Sch. Dist. No. 50*, 130 P.3d 1027, 1031 (Colo.2006). The term “belonging to,” particularly in the context of money, connotes “be[ing] the property of a person or thing.” *Webster’s Third New International Dictionary* 201 (3d ed. 2002).

¶33 However, we are constrained from applying a plain meaning if such a construction would lead to an absurd result. *See Board of County Comm'rs v. ExxonMobil Oil Corp.*, 192 P.3d 582, 586 (Colo.App.2008) (declining to interpret a statute in a manner that leads to an absurd or unreasonable result), *aff'd*, 222 P.3d 303 (Colo.2009). Trujillo's suggested interpretation, incorporating the plain meaning of "belonging to," would reach such a result. Under this interpretation, a bail bonding agent would be required to investigate and determine who actually owned the money given to him or her to post a bond. This requirement could be particularly burdensome in situations in which several people pool money to provide the premium for a defendant's bond.

¶34 Ultimately, the result advocated by Trujillo is unrealistic and inefficient; it would place bonding agents in the position of violating the statute and accompanying regulations if they incorrectly determined the ownership of money given to them to post a bond. Any such requirement would greatly increase bonding agents' responsibilities and expose them to increased liability.

¶35 We thus reject the literal interpretation of section 10–2–704(1)(a) in the bail bonding context and determine whether the Division's interpretation that a fiduciary relationship existed between Espinoza and Trujillo is permissible when viewing the statute as a whole and as part of the statutory scheme regulating bail bonding agents. *See, e.g., AviComm, Inc. v. Colorado Pub. Utilities Comm'n*, 955 P.2d 1023, 1031, 1033 (Colo.1998).

¶36 Under common law, a "fiduciary" is a person who has a duty, created by his or her undertaking, to act primarily for the benefit of another in matters within the scope of that relationship. *Brodeur v. American Home Assurance Co.*, 169 P.3d 139, 151 (Colo.2007). As a part of that duty, the fiduciary owes a duty of loyalty and must deal with utmost good faith and solely for the benefit of the beneficiary. *See Destefano v. Grabrian*, 763 P.2d 275, 284 (Colo.1988); *see also Diesel Motors Co. v. Kaye*, 74 Misc.2d 302, 345 N.Y.S.2d 870, 870 (N.Y. County Ct.1973) (insurance broker has fiduciary duty to return unearned premiums to insured, even unearned premiums lent by broker to insured).

¶37 Pursuant to the meaning of "fiduciary," we agree with the Division that absent an express agreement providing otherwise, the insurance provider statutes in title 10 which govern bail bonding agents establish a fiduciary relationship when an agent accepts a premium from the insured or the insured's agent. *See* § 10–2–704(1)(a). The bail bonding agent then has a duty to use the money to secure the bond that the insured or the insured's agent requested and a duty to return any unearned premium to the insured or the insured's agent. *See* § 10–2–704(2), C.R.S.2011.

¶38 The Division's interpretation of section 10–2–704(1)(a) is also reasonable when viewed as part of the statutory scheme regulating bail bonding agents. *State v. Nieto*, 993 P.2d 493, 501 (Colo.2000) (construing a statute "to further the legislative intent represented by the entire statutory scheme"); *see also Yuma County Bd. of Equalization v. Cabot Petroleum Corp.*, 856 P.2d 844, 849–50 (Colo.1993) (under the doctrine of in pari materia, a court will interpret a statute by examining other statutes dealing with the same subject).

¶39 Section 12–7–108, C.R.S.2011, requires a bonding agent to execute an agreement with "the defendant, or the third-party indemnitor, as applicable" for the payment of premium and fees, § 12–7–108(8), C.R.S.2011, and to issue a receipt to the "indemnitor" upon receipt of money or consideration for a bond, which should include "the terms under which the money or other consideration shall be released," § 12–7–108(4), C.R.S.2011. Here, the ALJ found, and the Division affirmed his finding, that Espinoza was a "third-party indemnitor" because "she put up the money for the bond." Under the statute, Trujillo thus owed Espinoza certain obligations as an indemnitor, regardless of whether she owned the bond money.

¶40 Similarly, a bail bonding agent must "preserve without use and retain separately, or ... return collateral taken as security on

any bond to the principal, *indemnitor*, or *depositor* of such collateral." § 12–7–106(1)(g), C.R.S.2011 (emphasis added). Although collateral is a separate security interest from a premium, the statute's silence regarding ownership of the collateral is once again telling. The statute requires the agent to record who *gave* him or her the collateral, without requiring that the agent determine and record who actually owns it. *See also* § 12–7–108(4) (agent must give to "each indemnitor" a receipt for money received therefrom). Accordingly, the Division's interpretation that Trujillo assumed fiduciary responsibilities concerning Espinoza upon receiving the $3,500, regardless of whether she owned the money, is consistent with his other statutory duties as a bail bonding agent.

¶ 41 The absence of a Division regulation requiring bonding agents to track the original source of all bail money received further supports the agency's interpretation of section 10–2–704(1)(a), given the otherwise detailed record-keeping rules. A bail bonding agent's responsibilities include maintaining a daily bond register, using pre-numbered receipts, executing agreements, issuing disclosure statements for each bond posted, and keeping permanent office records. *See* Regulation 1–2–14. Pre-numbered receipts must be used "whenever money or any other consideration for a bond ... is received by the bail bonding agent." *Id.* § 5(B)(1). The receipt is required to contain certain information, including the name of the defendant, the purpose for which the consideration or money was received, the name of the indemnitor, and the terms under which the money or other consideration will be released. *Id.* § 5(B)(2). Executed agreements and indemnity agreements must be signed and dated by the defendant or third-party indemnitor. *Id.* § 5(C)(4). No regulation, however, requires a bonding agent to account for—much less return the correct sum to—all persons who contributed the bond premium.

¶ 42 In summary, neither the statutes nor regulations require bail bonding agents to determine the source of consideration paid to them to post a bond or to return the money to a source other than the individual who entrusted the money to the bonding

agent. We presume that if the legislature intended such a result, it would have expressly included this responsibility in section 10–2–704(1)(a).

¶ 43 Accordingly, the Division's interpretation that, in the absence of an express agreement, a fiduciary relationship is established between a bail bonding agent and an insured or the insured's agent when the bonding agent receives a bond premium therefrom, regardless of ownership of the premium, is based on a permissible construction of section 10–2–704(1)(a) and the statutory scheme as a whole, and is not contrary to law. Therefore, the Division's interpretation is entitled to deference. Because it is undisputed that Espinoza gave the $3,500 to Trujillo, we further conclude that the Division's ultimate finding that Trujillo had a fiduciary duty to Espinoza and breached that duty in failing to return the money to her was reasonable and supported by substantial evidence.

### III. Effect of Clear Error on Division's Final Decision

¶ 44 Trujillo also contends that the Division abused its discretion in adopting the ALJ's ultimate conclusions of fact that he breached a fiduciary duty, misappropriated money, and acted fraudulently. Specifically, he maintains, because the Division properly overturned for clear error the ALJ's finding that suggested the original source of the $3,500 could be someone other than Cordova, its ultimate conclusion that Trujillo was required to return the money to Espinoza was unsupported by substantial evidence. We disagree.

### A. Standard of Review

¶ 45 The APA continues to govern our review. As noted, we may reverse the decision of an administrative agency if we find the agency acted arbitrarily or capriciously, made a decision unsupported by the record, erroneously interpreted the law, or exceeded its authority. § 24–4–106(7), (11)(e); *see also Lawley*, 36 P.3d at 1247.

¶ 46 An agency may not set aside an ALJ's finding of evidentiary fact unless it is contrary to the weight of the evidence. § 24–4–105(15)(b), C.R.S.2011; *Samaritan Inst.*, 883 P.2d at 9–10 ("requir[ing] the agency to dis-

cover a clear error in the hearing officer's determinations to set them aside").

 ¶ 47 Where the decision under review concerns an ultimate conclusion of fact, reversal is warranted only if the conclusion is not supported by substantial evidence in the record when viewed as a whole and has no reasonable basis in law. *Samaritan Inst.*, 883 P.2d at 9.

### B. Analysis

 ¶ 48 In its final order, the Division set aside the ALJ's evidentiary fact that "[t]he original source of the $3,500 is not clear from the record." Based on Espinoza's own testimony that the $3,500 came from Cordova, the Division determined that this finding amounted to clear error.[3]

¶ 49 At the hearing, Espinoza, Cordova, Cordova's roommate, and Espinoza's son's attorney all testified that Cordova provided Espinoza at least $3,500 worth of money orders which were later cashed to bail out Espinoza's son. Only Espinoza's son testified otherwise, stating that Cordova contributed only $2,000, which she previously owed him. The ALJ made no specific credibility determinations concerning this testimony or that of the other witnesses in finding that the source of the $3,500 was unclear.

¶ 50 Accordingly, we agree that the weight of the evidence before the ALJ established that Cordova delivered the $3,500 to Espinoza as payment toward Espinoza's son's bond. We therefore perceive no error in the Division's determination to set aside the ALJ's finding.

¶ 51 We are not persuaded, however, that in light of the Division's decision to set aside this finding, its adoption of the ALJ's initial decision in all other respects is unsupported by substantial evidence.

¶ 52 The record establishes that Espinoza entrusted Trujillo with $3,500 to post bail for her son, which he failed to do. Because Trujillo established a fiduciary relationship with Espinoza by accepting money from her in the first instance as discussed above, whether the money ultimately belonged to

Cordova bears no significance concerning his fiduciary duties to Espinoza. The statutory scheme discussed above therefore required Trujillo to return the money to Espinoza within forty-eight hours of failing to post bond for her son. *See* § 10–2–704.

¶ 53 Accordingly, we conclude that the Division's final order, adopting the ALJ's ultimate conclusion of fact that Trujillo had a fiduciary duty to return the $3,500 to Espinoza and ultimate decision to deny renewal of his licenses based thereon, was not an abuse of discretion.

¶ 54 To the extent Trujillo argues that, regardless of whether he breached his fiduciary duty, the Division abused its discretion in affirming the ALJ's findings that he committed fraud, fraudulent practices, and misappropriation, we also disagree.

¶ 55 The ALJ's ultimate conclusions are supported by the following factual findings of the ALJ, which are supported by the record. Espinoza entrusted the $3,500 to Trujillo for the purpose of bailing out her son. Trujillo did not post bail for him and did not return the money to Espinoza. Rather, he remitted to Cordova the money, less a portion of the $3,500 she owed on a bond for her friend.

Trujillo has not articulated why the ALJ's analysis of sections 10–2–801(e) (misappropriation), (h) (unfair trade practice or fraud), or (i) (fraudulent, dishonest, or coercive, practices) was incorrect. Consequently, he has not adequately presented this issue for review. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim."); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

¶ 56 Order affirmed.

Judge DAILEY and Judge FOX concur.

---

**3.** The Division further noted, however, that conflicting testimony existed concerning whether this money was owed to or merely lent to Espinoza's son. To the extent that it did not set aside

the ALJ's findings involving the witnesses' conflicting testimony about *why* Cordova gave this money to Espinoza, we need not address this statement.